MORTON COUNTY, a Political subdivision of the State of North Dakota, and a body corporate; Mandan Public School District No. 1 of Morton County, State of North Dakota, a body corporate; and New Salem School District No. 7 of Morton County, State of North Dakota, a body corporate, Petitioners and Appellees,

v.

Raymond HENKE as the Director of Tax Equalization of Oliver County, North Dakota, and as the Treasurer of Oliver County, North Dakota, Respondent and Appellant.

Civ. No. 9937.

Supreme Court of North Dakota.

July 9, 1981.

Richard L. Schnell, States Atty., Mandan, for Morton County.

Kelsch Law Firm, Mandan, for Mandan Public School Dist. No. 1 and New Salem Public School Dist. No. 7; argued by Thomas F. Kelsch, Mandan.

John Mahoney, States Atty., Center, for respondent and appellant.

SAND, Justice.

This is an appeal by the respondent, Raymond Henke, in his capacity as director of tax equalization of Oliver County and as treasurer of Oliver County [hereinafter referred to as Oliver County], from a district court peremptory writ of mandamus ordering Oliver County to share its coal production severance tax payments with the petitioners, Morton County, Mandan Public School District No. 1, and New Salem Public School District No. 7 [hereinafter referred to as Morton County and the school districts].

Morton County and the school districts base their claims to share in the coal development fund money upon North Dakota Century Code Ch. 57–62, which went into effect on 1 July 1979. Section 57–62–02, NDCC, allocates the coal severance tax revenue (See NDCC Ch. 57–61) in the coal development fund, and in relevant part provides:

"3. . . .

"a. . . .

"b. *If the tipple of a currently active coal mining operation in a county is within fifteen miles* [24.14 kilometers] *of another county in which no coal is mined,* the revenue apportioned according to this subsection shall be allocated as follows:

(1) Thirty percent shall be paid by the county treasurer of the coal-producing county to the incorporated cities of that county and to any city of a non-coal-producing county when any portion of the city lies within fifteen miles [24.14 kilometers] of the tipple of a currently active coal mining operation in a coal-producing county, based upon the population of each incorporated city according to the last official regular or special federal census or the census taken in accordance with the provisions of chapter 40–02 in case of a city incorporated subsequent to such census.

(2) Forty percent shall be divided by the county treasurer of the coal producing county between the general fund of the coal-producing county and the general fund of any non-coal-producing county when any portion of the latter county lies within fifteen miles [24.14 kilometers] of the tipple of a currently active coal mining operation in the coal-producing county. The non-coal-producing county portion shall be based upon the ratio which the assessed valuation of all quarter sections of land in that county, any portion of which lies within fifteen miles [24.14 kilometers] of the tipple of a currently active coal mining operation, bears to the combined assessed valuations of all land in the coal-producing county and the quarter sections of land in the non-coal-producing county within fifteen miles [24.14 kilometers] of the tipple of the currently active coal mining operation. It shall be the duty of the county director of tax equalization of the coal-producing county to certify to the treasurer of the same county the number of quarter sections of land in

the non-coal-producing counties which lie at least in part within fifteen miles [24.14 kilometers] of the tipple of a currently active coal mining operation and their assess valuations.

(3) Thirty percent shall be apportioned to the county treasurer of the coal-producing county to school districts within that county and to school districts in adjoining non-coal-producing counties when a portion of those school districts' land includes any of the quarter sections of land certified by the director of tax equalization to the county treasurer to be eligible to share county funds as provided for in paragraph 2. The county superintendent of the non-coal-producing counties shall certify to the county treasurer of the coal-producing county, the number of students actually residing on these quarter sections lying outside the coal-producing county and each school district in non-coal-producing counties shall receive a portion of the money under this paragraph based upon the ratio of the number of children residing on quarter sections of that school district within the fifteen miles [24.14 kilometers] radius of a currently active coal mining operation to the total number of school children from the coal-producing county combined with all the school children certified to be living on quarter sections within fifteen miles [24.14 kilometers] of the tipple of a currently active coal mining operation in the coal-producing county." [Emphasis added.]

Morton County has been a non-coal-producing county and Oliver County has been a coal-producing county sometime before and since this statute went into effect on 1 July 1979.

In August 1980 William Heisler, Morton County superintendent of schools, in a letter sent to Raymond Henke sought a share of the coal tax funds for the Morton County children residing within a fifteen-mile radius of the tipple of the Baukol-Noonan mine in Oliver County. The Oliver County Commission directed Henke not to disburse any coal development funds to Morton County because the Oliver County Commission was of the opinion that a tipple did not exist at the Baukol-Noonan mine, and therefore the sharing provisions for the money in the coal development fund were not applicable. Based on this, Oliver County declined to share any coal development fund with Morton County and the school districts.

Oliver County's opinion that no tipple existed was based upon the following three reasons:

(1) A tipple is a facility for crushing and treating coal and loading it into trucks or railroad cars for transit, and Baukol-Noonan does not have such a facility;

(2) The 1979 amendment to Ch. 57–62, NDCC, was meant to alleviate the impact problems of two specific areas, Velva and Reeder-Scranton, and not the Baukol-Noonan mine; and

(3) Where a tipple exists, consumers will travel to the tipple and haul coal from it within a fifteen-mile radius; however, at Baukol-Noonan the coal was used by Minnkota Power at the place it was dumped.

The record reflects that the operation conducted at the Baukol-Noonan mine is in some ways unique. All the coal is strip-mined at Baukol-Noonan and is sold to Minnkota Power Cooperative for the operation of their Milton R. Young and Square Butte coal-fired electric generating plants. After the coal is severed from the Baukol-Noonan mine, it is loaded into trucks and hauled two miles to Minnkota's generating plants, where it is dumped into underground coal hoppers. Minnkota handles the coal from this point. The underground coal hoppers feed the coal into primary crushers which perform the initial stage of crushing. After the initial stage of crushing, the coal is transferred by conveyor belt to a secondary crusher. From the secondary crusher, the coal is moved to a stockpile for later movement into the plant furnaces.

The coal is weighed on a scale located between the primary and secondary crushers which establishes the coal tonnage. This weight forms the basis of Baukol-Noonan's charge to Minnkota for the tons of coal delivered. This weight also constitutes the basis for calculating the landowner's royalty and the coal severance tax. See NDCC Ch. 57–61. These operations are all within the fifteen miles of Morton County and the school districts.

On 4 Nov. 1980, Morton County and the school districts filed a petition for an alternative writ of mandamus. The parties filed affidavits on behalf of and against the writ. Morton County and the school districts contended that they were within 15 miles of a "tipple" of a currently active coal mine in Oliver County, the Baukol-Noonan mine. Oliver County contended that the activities at the Baukol-Noonan mine were unique and did not constitute a tipple, and therefore the 15-mile radius provision setting into motion the sharing of the coal production severance tax revenues with Morton County and the school districts was not applicable.

After a show cause hearing on the alternative writ of mandamus, the district court determined that a tipple existed at the Baukol-Noonan mine, and that Oliver County had to share the severance tax revenues pursuant to NDCC § 57–62–02(3). Oliver County appeals from that decision.

The overriding issue on this appeal is whether or not a tipple, within the meaning of NDCC Ch. 57–62 exists at the Baukol-Noonan mine. In resolving this issue we must also take into account our statutory and case law pertaining to writs of mandamus.

Section 32–34–01, NDCC, regarding writs of mandamus provides in part as follows:

"The writ of mandamus may be issued by the supreme court and district courts to any inferior tribunal, corporation, board, or person to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station . . . .".

■ The applicant for a writ of mandamus must show the existence of a legal right to the performance of the particular act sought to be compelled by the writ. *City of Fargo v. Cass County*, 286 N.W.2d 494 (N.D.1979). The applicant must also establish that a plain, speedy, and adequate remedy is not available in the ordinary course of law. NDCC § 32–04–02; *City of Fargo v. Cass County, supra.*

■ A writ of mandamus does not apply to compel acts which are discretionary. *City of Fargo v. Cass County, supra.*

Oliver County relies upon affidavits of four people involved in the coal mining industry to support its contention that Baukol-Noonan does not have a tipple. These affidavits, in substance, state that a tipple is a preparation plant which crushes, screens, and treats the coal and has facilities to load the coal into railroad cars or trucks. All four of the affidavits state that the Baukol-Noonan mining operation does not have a tipple within this definition. Although these affidavits may, to some degree, be helpful in ascertaining the meaning of a tipple, they are not necessarily indicative of the legislative intent surrounding the enactment of Ch. 57–62, NDCC.

■ The primary purpose of statutory construction is to ascertain the intent of the Legislature. *State v. Moore*, 286 N.W.2d 274 (N.D.1979); *Hughes v. State Farm Mutual Automobile Insurance Co.*, 236 N.W.2d 870 (N.D.1975). A statute must be considered as a whole with a view toward arriving at the intent of the Legislature. *Apple Creek Township v. City of Bismarck*, 271 N.W.2d 583 (N.D.1978); *Horst v. Guy*, 219 N.W.2d 153 (N.D.1974). The Legislature's intent in enacting a statute must first be sought from the language of the statute. *Apple Creek Township v. City of Bismarck, supra.*

■ In interpreting a statute, words are to be given their plain, ordinary, and commonly understood meaning; and consideration should be given to the ordinary sense of statutory words, the context in which they are used, and the purpose which

prompted their enactment. Section 1–02–02, NDCC; *Weber v. State Farm Mutual Automobile Insurance Co.*, 284 N.W.2d 299 (N.D.1979).

■ If a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit because the legislative intent is presumed clear from the face of the statute. Section 1–02–05, NDCC; *Barnes County Education Association v. Barnes County Special Education Board*, 276 N.W.2d 247 (N.D.1979).

■ If a statute's language is ambiguous or of doubtful meaning, then resort may be had to extrinsic aids. *Apple Creek Township v. City of Bismarck, supra.*

Section 1–02–39, NDCC, lists certain extrinsic aids which, in addition to the language of the particular statute, may be used to ascertain the intent of the Legislature. That section provides as follows:

"If a statute is ambiguous, the court, in determining the intention of the legislation, may consider among other matters:

1. The object sought to be attained.

2. The circumstances under which the statute was enacted.

3. The legislative history.

4. The common law or former statutory provisions, including laws upon the same or similar subjects.

5. The consequences of a particular construction.

6. The administrative construction of the statute.

7. The preamble."

We must now determine whether the term "tipple" is precise or ambiguous.

■ Webster's New Third International Dictionary defines tipple as:

"an apparatus by which loaded cars are emptied by tipping sometimes including an elevated runway or framework upon which the cars are run for tipping—compare tip: the place where tipping is done: tip, *specif*: a coal-screening plant."

Oliver County asserts that a tipple, as reflected by the affidavits submitted by them, requires more than just the initial dumping of coal and, in fact, includes a preparation plant. Oliver County asserts that a tipple is a facility which crushes, screens, and treats coal and has the facilities to load the coal into receptacles, such as railroad cars or trucks.

Morton County and the school districts agree with the district court's determination that a "tipple is a place where the initial unloading, processing, or transporting to the ultimate consumer takes place".

Because the interpretations asserted by both sides are plausible, we find, and it is apparently conceded by both sides, that the term "tipple" is ambiguous. Therefore, it is necessary to consider the extrinsic interpretation factors set forth in NDCC § 1–02–39, in addition to the language of NDCC § 57–62–02.

Prior to 1 July 1979, coal severance impact aid money was distributed within the boundaries of coal-producing counties.[1] In 1979 the Legislature attempted to provide an equitable allocation of impact funds be-

---

1. North Dakota Session Laws, 1977, Ch. 560, § 12, which was codified at NDCC § 57–62–02(3), before the enactment of the present law provided as follows:

"Twenty percent shall be allocated to the coal-producing counties and shall be distributed among such counties in such proportion as the number of tons of coal severed in each county bears to the total number of tons of coal severed in the state during such quarterly period. Such allocations shall be apportioned as follows:

a. Thirty percent shall be paid by the county treasurer to the incorporated cities of the county based upon the population of each

incorporated city according to the law official regular or special federal census or the census taken in accordance with the provisions of chapter 40–02 in case of a city incorporated subsequent to such census.

b. Forty percent shall be deposited by the county treasurer in the county general fund to be used for general governmental purposes.

c. Thirty percent shall be apportioned by the county treasurer to school districts within the county on the average daily membership basis, as certified to him by the county superintendent of schools."

tween coal-producing and non-coal-producing counties in situations in which an active coal mine was near a county line. The statutory provisions enacted in 1979 allocated a portion of the coal severance impact aid money to areas within a 15-mile radius of a "tipple" of a currently active coal mine.[2] The term "tipple" apparently was used as a reference point because in the open strip mining process employed by North Dakota the location of the actual coal mine moves as the coal is severed from the mine. The term "tipple" in the 15-miles radius was used to solve some of the problems involved in making an equitable distribution of the coal severance funds to impacted areas.

Representative Alvin Hausauer introduced House Bill 1402 (Ch. 57-62 NDCC) and made the following statement which is reflected in the minutes of the Committee on Finance and Taxation:

"We made no provision when the coal mine is in one county and the impact is in another county and another school district. Reeder and Velva are *two examples* that have more impact than some towns in the county do. Kenmare in Ward County gets impact funds and Velva in McHenry County gets none of it. This bill says that where a coal mine is within 15 miles of an adjoining county the land within the 15-mile area and the school district would get some impact funds on a per pupil basis. The county would get some on valuation of land and the cities would get some also." [Emphasis added.]

After reviewing this statement and other available legislative committee reports relating to the enactment of House Bill 1402, we are satisfied that the legislative intent was to provide a coal development impact aid program which equitably allocates coal severance tax moneys collected through NDCC Ch. 57-61 to impact areas of coal-producing and non-coal-producing counties. More specifically, the statute provides for sharing in the distribution of impact funds where coal extraction is in one county and the coal development impact is also present in a neighboring county. The basis of the distribution requires a determination of where the "tipple" of a currently active coal mine is located.

This background implies that whenever active coal mining takes place within a county there is an attendant impact on that county and a possible impact on adjacent counties. The funds available for impact distribution arise from the fact that there is active coal mining in a county. The purpose of Ch. 57-62 is to provide a method of allocating the funds to impacted areas even though that area may be in a neighboring county. To accomplish this the Legislature established a reference point of 15 miles from a "tipple" of a currently active coal mine to determine whether or not an area was impacted. We agree with the district court that if the redistribution of impact funds to impacted areas could be avoided merely by the mechanical method by which the coal is processed after the initial dumping, the whole intent of the Legislature to distribute the funds to impacted areas would be defeated.

Further, we believe the language of the statute presumes that, for purposes of impact aid, each currently active coal mine has a tipple. The relevant language of NDCC § 57-62-02(3)(b) begins with "If the tipple of a currently active coal mining operation" and this language necessarily indicates that the Legislature assumed that for purposes of coal severance tax distribution each currently active coal mine has a tipple. Oliver

---

2. "Tipple" was not defined in the legislation enacted in 1979. During the 1981 legislative session an attempt was made to define "tipple" in Senate Bill 2362. The bill was introduced by Senator Albers and provided as follows:

"Tipple" means the place or facility where the initial unloading of coal for processing or transporting to the ultimate consumer takes place.

This definition was essentially the district court's interpretation of a tipple.

A proposed amendment was also submitted by Senator Albers, which provided as follows:

"Tipple" means a preparation plant where the coal is prepared and stored with facilities for loading the coal into receptacles such as trucks or railroad cars for transportation.

County's contention would be more plausible if the Act had provided: "If a currently active coal mining operation has a tipple which is within 15 miles, etc." But this is not the case. The context in which a word is used determines its true and exact meaning.

We also note that Representative Hausauer's statement, as previously set out, refers to a situation in which a "coal mine" is within 15 miles of an adjoining county. We believe that the use of the term "coal mine" further reflects that the Legislature contemplated that each currently active coal mine would have a tipple.

Oliver County asserts that the available legislative committee reports reflect that the primary areas of concern which prompted House Bill 1402 were the Reeder-Scranton area and the Velva area.[3]

Thus, Oliver County asserts that because the Baukol-Noonan mine was not referred to during the committee reports, the Legislature did not intend to include the Baukol-Noonan mine in this chapter. We disagree.

The earlier quoted statement of Representative Hausauer reflects that Reeder-Scranton and Velva were only *two examples* of mines in coal-producing counties which have impact on towns which are not within that county. Additionally, there was a map of the State's coal mines distributed at the legislative hearings showing the location of all currently operating coal mines in North Dakota, including Baukol-Noonan.

Furthermore, the North Dakota Constitution prohibits the enactment of local or special laws.[4]

Chapter 57–62, NDCC, is neither a local law or a special law, rather it is a general law and operates with uniformity upon all active coal mining operations. There is no language in the bill suggesting it applies only to two coal mines. The two situations mentioned in the legislative committee were only cited as examples. Further, there would be serious doubts as to the constitutionality of Ch. 57–62 if it only referred (by name) to the two coal mining operations.

In applying the foregoing principles we conclude that the term "tipple" as found in NDCC Ch. 57–62 means the initial place where coal is unloaded after it has been severed from the mine. We further conclude that the Baukol-Noonan mine "tipple" is at the unloading point at the Minnkota Power Plant.

Oliver County also asserts the district judge improperly relied upon his "extensive experience with the mining operations of northern Minnesota," as set forth in his memorandum opinion which provides, in part, as follows:

"The writer has had extensive experience with the mining operations of northern Minnesota. In the case of iron ore mines, a number of devices were used which could presumably constitute a tipple. Originally, as the iron ore was dug, it was so pure and of such consistency that it

---

3. The tipple at the Gascoyne mine in Bowman County is about two miles from the Adams County line and five miles from Reeder. Reeder is in Adams County and did not receive severance tax funds under the impact aid law before the 1979 15-mile amendment. The tipple at the Velva mine is in Ward County just across the county line from Velva, which is in McHenry County. Velva, like Reeder, received no severance tax payments before the amendment.

4. Article IV, Section 43, of the North Dakota Constitution provides that "the legislative assembly shall not pass local or special laws in any of the following enumerated cases" and then sets out 35 subjects covered. Section 44 of the North Dakota Constitution provides:

"In all other cases where a general law can be made applicable, no special law shall be enacted; nor shall the legislative assembly indirectly enact such special or local law by the partial repeal of a general law; but laws repealing local or special Acts may be passed."

In *State v. Lawler*, 53 N.D. 278, 205 N.W. 880 (1925), and in *State v. First State Bank of Jud*, 52 N.D. 231, 202 N.W. 391 (1924), this court defined a special law as one relating only to a particular person or things of a class, as distinguished from a general law which applies to all things or persons of a class, and a local law as one which applies to a specific locality or spot, as distinguished from a law which operates generally throughout the state.

could be dumped directly into loading pockets for ultimate direct delivery to railroad cars. Later, when the ore became less pure, washing plants were established to remove certain impurities, so the ore was hauled to their location. As the taconite industry developed on the Iron Range, crushers were established, much in the fashion as exist in the coal industry, where initial dumping took place. Depending on the facts and circumstances of each particular case, the tipple could have been located at each or any of those places."

Regarding the Judge's reference to his experience, we note that to a degree we are all prisoners of our own environment and experiences, and as such our communications to some extent frequently involve and reflect our previous experiences. Judicial decisions are not rendered in a vacuum and in articulating the thought process involved, previous experiences are apt to surface. In this instance, the Judge's reference to his experience clearly supported the accepted fact that the term "tipple" has various meanings depending on the manner in which it is used.

 We cannot state that the trial court erred in referring to his personal experiences and observations regarding the meaning of the term "tipple."

Furthermore, a trial judge's statutory construction is not subject to the provisions of Rule 52(a), North Dakota Rules of Civil Procedure.

We agree with the district judge's ultimate decision that a tipple exists at the Minnkota Power Plant, the unloading point of the Baukol-Noonan coal mining operation.

Because there is a tipple within the meaning of Ch. 57–62 at the Baukol-Noonan mine, within 15 miles of Morton County and the school districts, the provisions of Section 57–62–02(3)(b), NDCC, regarding the distribution of the coal development funds become operative. There is no discretion on Oliver County's part to determine whether or not a tipple exists, and the only

actions required of Oliver County are to comply with the statutory procedures for distributing the funds. Furthermore, if these actions are not completed there is no plain, speedy, and adequate relief in the ordinary course of law for Morton County and the school districts. Based on the foregoing, we conclude that the writ of mandamus was properly issued by the district court.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.