HALL GMC, INC., Plaintiff, Appellee
and Cross-Appellant,

v.

CRANE CARRIER COMPANY, Defend-
ant, Appellant and Cross-Appellee.

Civ. No. 10286.

Supreme Court of North Dakota.

March 17, 1983.

Tenneson, Serkland, Lundberg, Erickson & Marcil, and Hanson, Crockett & Anderson, Fargo, for plaintiff, appellee and cross-appellant; argued by Steven K. Aakre, Fargo.

Pancratz, Yuill, Wold, Johnson & Feder, Fargo, for defendant, appellant and cross-appellee; argued by J. Philip Johnson, Fargo.

SAND, Justice.

The defendant, Crane Carrier Company (Crane), appealed from a district court judgment entered on 2 August 1982 in favor of the plaintiff, Hall GMC, Inc. (Hall), in the amount of $52,223.97, together with costs and disbursements in the amount of $264.70, and Hall cross-appealed.

Hall is a truck and parts dealer, with its office located in Fargo, North Dakota, and Crane is a truck and parts manufacturer with its principal office and plant located in Tulsa, Oklahoma. Prior to 13 October 1976 Hall sold, among other items, parts supplied by Crane. On 13 October 1976 Hall, through its president, Gerald M. Hall, entered into a distributor agreement with Crane, through its vice president of sales, Fred M. Burns, whereby Hall agreed to maintain and sell an inventory of Crane vehicles and parts and to maintain service facilities for the repair of Crane vehicles. The agreement permitted termination of the distributorship by four methods, including mutual consent of the parties at any time, or by Hall upon not less than sixty days' prior written notice to Crane.

The issues raised in this appeal and cross-appeal involve the rights and obligations of Hall and Crane resulting from the facts and circumstances leading up to and surrounding Hall's termination of the distributor agreement.

In the fall of 1978 Hall's inventory included three Crane refuse trucks. In October 1978 Hall submitted a written order to Crane for four concrete mixers for delivery in March 1979. The order form and distributor agreement did not provide for cancellation of an order without Crane's consent. Gerald Hall testified that the order was made, in part, because of assurances by Thomas Shumway, regional manager for Crane, that he would continue to assist Hall in transferring and selling its unsold inventory of Crane vehicles.

In January 1979 Hall, through its sales manager, John Kuehl, sent a letter to Crane requesting cancellation of the order for the four concrete mixers, and Shumway contacted Kuehl to discuss the order. Shumway testified that he told Kuehl that the cancellation could not be accepted. Kuehl testified that he recalled Shumway discussing reinstating the order and was left with the impression that the order was not in effect. In any event, an inter-office memo prepared by Crane employees reflected that a change order was entered on 12 January

1979 cancelling the order and that Crane management reinstated the order on 19 January 1979.

In mid-June 1979 the four concrete mixers were ready for delivery and were invoiced to Hall. However, Hall indicated to Crane that it did not want to accept the concrete mixers because it believed the order had been cancelled.

In July 1979 Gerald Hall, met with Shumway in Fargo and a compromise was discussed whereby Hall agreed to return to Crane the earlier-mentioned three unsold refuse trucks still in its inventory in exchange for credit, and Hall agreed to accept the four concrete mixers. The difference between the credit received by Hall for the three refuse trucks and the cost of the four concrete mixers was $44,891.00. The agreement was subject to approval by Shumway's supervisor; however, credit memos reflecting a credit to Hall's account for the refuse trucks were issued by Crane in July 1979. Gerald Hall and James Wade, vice president of Crane, formally agreed to the exchange in September 1979. In October 1979 Hall arranged to have the refuse trucks returned to Crane.

Gerald Hall testified that, at the time of this agreement, he did not intend to terminate the Crane distributorship; however, he began to consider termination later in September because of the downward trend in the economy and because Shumway had been transferred to another region and his replacement was not as helpful in transferring unsold inventory.

In October 1979 Gerald Hall met with his attorney and discussed Hall's legal rights regarding termination of the Crane distributorship. Gerald Hall's attorney advised him, in a written opinion, that, if he decided to terminate the distributorship, the provisions of the distributor agreement and North Dakota Century Code Ch. 51–07 permitted him to return "current" year vehicles to Crane for one hundred percent of the net cost. Hall's attorney recommended that, in order to avoid a question of the meaning of "current," he should exchange 1979 model vehicles for 1980 model vehicles.

In November 1979 Gerald Hall asked Wade to change the Manufacturer's Statement of Origin [1] (MSO) for each of the four concrete mixers from 1979 models to 1980 models. Gerald Hall testified that he wanted the model year changed because the sale of 1980 models would be easier and because he would have a better chance to have Crane repurchase the 1980 models if he chose to terminate the distributorship.

On 14 December 1979 Crane issued "corrected" MSO's designating the concrete mixers as 1980 models. This correction was a paper transaction and did not involve any physical changes to the vehicles. On 19 December 1979 Hall issued a check for $44,891.00 payable to Crane for the difference between the credit received on the three refuse trucks and the cost of the four concrete mixers.

Gerald Hall testified that in late January 1980 he decided to terminate the Hall distributorship of Crane vehicles, and he sent a letter of "mutual termination" dated 22 January 1980 to Wade. Hall's letter included a copy of his attorney's written opinion discussed earlier herein. Crane, through its general counsel, responded with a letter dated 20 February 1980 declining to consent to Hall's "mutual termination." Hall responded with a letter dated 25 February 1980 notifying Crane of its unilateral termination of the distributor agreement, specifically citing NDCC § 51–07–01. Hall's letter stated that it was returning the four mixers which were still in Crane's possession. Hall's letter further stated that the total sum of $174,529.00, representing one hundred percent of the net cost of the four concrete mixers, was due from Crane and that upon receipt of Crane's check Hall would return the MSO's for the four concrete mixers to Crane.

Counsel for Crane informed Hall that, notwithstanding North Dakota law and the distributor agreement, Crane did not believe it was under an obligation to repurchase the four mixer trucks and refused to pay Hall the $174,529.00.

Hall initiated an action against Crane alleging that it paid Crane $174,529.00 for the four concrete mixers with money borrowed from General Motors Acceptance Corporation (GMAC) and that, pursuant to the distributor agreement and NDCC Ch. 51–07, Crane owed and refused to pay Hall one hundred percent of the net cost ($174,529.00) for the four "current" model concrete mixers.

On 20 November 1980 the court ordered both Crane and Hall to exert their best efforts to sell the four concrete mixers. All four concrete mixers were separately sold. As each concrete mixer was sold, the cost of each mixer was paid to GMAC to reduce Hall's loan balance.[2]

The trial court awarded Hall damages in the amount of $52,223.97 for the interest paid by Hall on its inventory financing of the four concrete mixers with GMAC for the period beginning 60 days after the letter of mutual termination dated 22 January 1980. The trial court also awarded Hall the proceeds, including interest, from the sale of the mixers held in the trust account by counsel for Crane (see fn. 2); however, those proceeds were set off against the award of damages to Hall. Judgment was entered on 2 August 1982. Crane appealed from the judgment and Hall cross-appealed.

The resolution of several of the issues involved in this appeal requires us to initially note our statutory provisions concerning the cancellation or discontinuance of a dis-

---

1. Gerald Hall testified that a Manufacturer's Statement of Origin was a document used to transfer title from the manufacturer to the dealer.

2. The record reflects that three of the mixers were sold through the efforts of Crane. One mixer was sold on 22 July 1981, one on 5 October 1981, one on 10 November 1981, and corresponding checks payable to GMAC were issued to counsel for Hall on 11 August 1981, 5

November 1981, and 24 November 1981. The record reflects that profits on the sale of these three mixers were put in a separate interest-bearing bank account pending trial. As of 1 January 1982 the balance in that account was $2,692.79.

The fourth mixer was sold by Hall on 16 December 1981 and no net proceeds were available from that sale.

tributorship. When a distributor agreement is cancelled or discontinued, NDCC § 51–07–01[3] requires the manufacturer (Crane) to pay the retailer (Hall) "a sum equal to one hundred percent of the net cost of all current unused complete ... trucks," and, "upon payment of [that sum] ... the title to such ... trucks ... shall pass to the manufacturer." This statutory provision essentially requires a manufacturer to repurchase from the retailer the "current" model trucks upon termination of a distributorship.

## CRANE'S APPEAL

Crane contended the trial court erred in finding that Hall did not act fraudulently in terminating the distributor agreement.

3. NDCC § 51–07–01 provides as follows:
 "Whenever any person, firm, or corporation engaged in the business of selling and retailing farm implements and repair parts for farm implements, or in the business of selling and retailing automobiles or trucks, or repair parts for automobiles or trucks, enters into a written contract whereby such retailer agrees to maintain a stock of parts or complete or whole machines, or attachments with any wholesaler, manufacturer, or distributor of farm implements, machinery, attachments, or repair parts, or automobiles, trucks, or repair parts, and *either such wholesaler, manufacturer, or distributor or the retailer desires to cancel or discontinue the contract, such wholesaler, manufacturer, or distributor, shall pay to such retailer unless the retailer should desire to keep such merchandise, a sum equal to one hundred percent of the net cost of all current unused complete farm implements, machinery, attachments, automobiles, and trucks* including transportation charges which have been paid by such retailer, and eighty-five percent of the current net prices on repair parts, including superseded parts listed in current price lists or catalogs which parts had previously been purchased from such wholesaler, manufacturer, or distributor, and held by such retailer on the date of the cancellation or discontinuance of such contract or thereafter received by such retailer from the wholesaler, manufacturer, or distributor. The wholesaler, manufacturer, or distributor shall also pay such retailer a sum equal to five percent of the current net price of all parts returned for the handling, packing, and loading of such parts back to the wholesaler, manufacturer, or distributor. Upon the payment of the sum equal to one hundred percent of the net cost of such farm implements, machin-

Our statutory definition of fraud includes actual fraud and constructive fraud. NDCC § 9–03–07. Actual fraud includes the suppression of that which is true by one having knowledge or belief of the fact; a promise made without any intention of performing it; or any other act fitted to deceive. NDCC § 9–03–08. Constructive fraud includes actions done without fraudulent intent but which are misleading. NDCC § 9–03–09.

Crane contended that Hall's actions in exchanging the three refuse trucks for four concrete mixers and requesting correction of the MSO's to reflect that the concrete mixers were 1980 models and not 1979 models, constituted actual or constructive fraud because those actions were done with no intention by Hall to continue the distribu-

ery, attachments, automobiles, and trucks, plus transportation charges which have been paid by the retailer and eighty-five percent of the current net prices on repair parts, plus freight charges which have been paid by the retailer, plus five percent of the current net prices for handling and loading costs on repair parts only, the title to such farm implements, farm machinery, attachments, automobiles, trucks, or repair parts, shall pass to the manufacturer, wholesaler, or distributor making such payment, and such manufacturer, wholesaler, or distributor, shall be entitled to the possession of such farm implements, machinery, attachments, automobiles, trucks, or repair parts.
 "The provisions of this section shall be supplemental to any agreement between the retailer and the manufacturer, wholesaler, or distributor covering the return of farm implements, machinery, attachments, automobiles, trucks, and repair parts so that the retailer can elect to pursue either his contract remedy or the remedy provided herein, and an election by the retailer to pursue his contract remedy shall not bar his right to the remedy provided herein as to those farm implements, machinery, attachments, automobiles, trucks, and repair parts not affected by the contract remedy.
 "The provisions of this section shall apply to all contracts now in effect which have no expiration date and are a continuing contract, and all other contracts entered into or renewed after July 1, 1971. Any contract in force and effect on July 1, 1971, which by its own terms will terminate on a date subsequent thereto shall be governed by the law as it existed prior to the 1971 amendment." [Emphasis added.]

torship and, instead, were done to intentionally deceive or mislead Crane so that, upon termination, Hall could receive one hundred percent of the net cost of the current model trucks.[4]

■ The existence of actual fraud is treated as a question of fact to be decided by the trier of fact. *Powers v. Martinson,* 313 N.W.2d 720 (N.D.1981); *Watkins Products, Inc. v. Stadel,* 214 N.W.2d 368 (N.D. 1974). Whether or not there have been fraudulent representations depend upon the facts of each case. *Gershman v. Engelstad,* 160 N.W.2d 80 (N.D.1968).

■ On appeal to this court findings of fact will not be set aside unless they are clearly erroneous and due regard must be given to the trial court to assess the credibility of the witnesses. *E.g., Hoge v. Burleigh County Water Management District,* 311 N.W.2d 23 (N.D.1981). A finding of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made. *In re Estate of Elmer,* 210 N.W.2d 815 (N.D.1973). Findings of fact made by the trier of fact upon conflicting evidence are not subject to reexamination by this Court. *Hoge v. Burleigh County Water Management District, supra.* The mere fact that an appellate court might have viewed the facts differently if it had been the initial trier of the case does not entitle it to reverse the lower court. *In re Estate of Elmer, supra.*

■ The trial court essentially found that Gerald Hall's decision to terminate was made in good faith; that he did not intend to deceive Crane when he agreed to exchange the refuse trucks for the concrete mixers; and that he made no misrepresentations when he requested the change in the model year of the concrete mixers.

Additionally, we must keep in mind that Hall was exercising its statutory and contractual right to terminate the distributor-

ship. Crane is charged with knowledge of the laws of the state in which it conducts business and consequently is charged with knowledge of the contents of NDCC Ch. 51–07. *Catholic Order of Foresters v. State,* 67 N.D. 228, 271 N.W. 670, 109 A.L.R. 979 (1937), *cert. denied,* 301 U.S. 665, 57 S.Ct. 796, 81 L.Ed. 1331 (1937). Consequently, when Crane corrected the MSO's it did so with an awareness of Hall's right to terminate and, in view of the trial court's findings and the knowledge chargeable to Crane, those actions cannot be characterized as misleading.

Although we recognize, as the trial court did, the factual circumstances surrounding Hall's decision to terminate the distributorship and his intention "approaches borderline," we also recognize that the evidence and inferences to be drawn from that evidence are as conflicting and it was within the province of the trier of fact to weigh and assess the credibility of witnesses in resolving the conflicting evidence. Accordingly, we conclude that the trial court's finding that Hall's actions did not constitute fraud is not clearly erroneous.

Crane also contended that Hall's actions prior to the termination of the distributor agreement fit within the equitable concept of estoppel. Crane contended that Hall engaged in a course of conduct in which it deliberately led Crane to believe that the distributorship would continue and that the four concrete mixers would be accepted and sold by Hall. However, the previously discussed findings of fact relating to fraud, which we have concluded are not clearly erroneous, and the knowledge of the law attributable to Crane do not reflect a course of conduct in which Hall deliberately misled Crane to believe the distributorship would continue.

■ Crane also contended that Hall's actions subsequent to the termination consti-

---

4. Crane's argument is based upon the premise that the 1979 model mixers were not "current" but that the 1980 model mixers were "current" and that, upon termination of the distributor agreement, Crane was obliged to repurchase only the "current" (i.e., 1980) mixers. The issues raised by this appeal do not require an interpretation of the term "current" within the context of NDCC § 51–07–01.

tuted an election of remedies or estoppel because those actions contradicted its position that the distributorship was terminated and that the "current" inventory was subject to repurchase by Crane. In particular, Crane argued that Hall continued to order parts from Crane after the termination and that Hall left a Crane advertising sign on its premises after the termination.

The record reflects that prior to the distributor agreement Hall handled, among other items, parts supplied by Crane. The record also reflects that Crane sold parts to other retailers in the Fargo-Moorhead area who were not distributors of Crane trucks. These factors support the conclusion that Hall's actions in continuing to sell Crane parts after the termination did not constitute an election of remedies or estoppel. Nor did the retention of the advertising sign on Hall's premises constitute an election of remedies or estoppel.

Crane also contended that the trial court erred in finding the agreement between Hall and Crane to exchange the three refuse trucks for the four concrete mixers was not an accord and satisfaction by which Hall gave up its right to terminate the distributorship and its rights upon termination. The trial court found that Hall and Crane at no time entered into an accord extinguishing Hall's right to terminate or its rights upon termination.

■ NDCC § 9–13–04 provides that an accord is "an agreement to accept in extinction of an obligation something different from or less than that to which the person agreeing to accept is entitled." NDCC § 9–13–05 provides that "Acceptance by the creditor of the consideration of an accord extinguishes the obligation and is called satisfaction." An essential element of an accord and satisfaction is mutual assent. *Frank v. Daimler-Benz, A.G., Stuttgart, West Germany,* 226 N.W.2d 143 (N.D. 1975). The party who pleads accord and satisfaction has the burden of proof. *Id.* Whether or not there is an accord and satisfaction is basically treated as a question of fact. *Id.*

In this instance no evidence was presented to merit a finding that Hall waived the statutory remedies provided for in NDCC § 51–07–01, nor was there evidence introduced indicating that Crane acted as it did upon any assurance given by Hall that it would not terminate the distributorship. Consequently, we conclude that the trial court's finding that Hall and Crane did not enter into an accord and satisfaction is not clearly erroneous.

Crane also contended that NDCC § 51–07–01 was subject to objection on constitutional grounds. Crane contended that the statute was obviously designed to favor a particular class of North Dakota residents and broadly asserted the statute was inconsistent with constitutional standards of interstate commerce, of impairment of contractual obligations, of deprivation of property without due process of law, and of special privileges and immunities.

■ A statute is conclusively presumed to be constitutional unless it is clearly shown that the statute contravenes the state or federal constitution. *Dorgan v. Kouba,* 274 N.W.2d 167 (N.D.1978). In *State v. Knoefler,* 279 N.W.2d 658, 662 (N.D.1979), we said:

> "It is now settled that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs as long as their laws do not run afoul of some specific federal constitutional prohibition or some valid federal law. In determining the constitutionality of statutes regulating commercial affairs under the Equal Protection Clause, courts have required only a rational relationship between the classification and the purpose of the statute."

■ The state has a significant and legitimate interest in providing protection to distributors of vehicles and farm implements because a distributor service is a substantial public need in our economic system. The protection granted to distributors by NDCC Ch. 51–07 is rationally related to the state's interest, and we conclude that those statutory provisions are not in violation of the state and federal constitution.

Finally, Crane contended that the trial court erred in awarding, as damages, interest substantially in excess of the statutory rate. Crane asserted that interest on Hall's loan with GMAC was not an appropriate element of damages under the statutory provisions because the statute authorizes only recovery of one hundred percent of the net cost of the trucks.

The trial court awarded damages based upon financing costs (interest) actually incurred by Hall on its loan with GMAC for the time period between 60 days after its letter of "mutual termination" of 22 January 1980 and the sale of each mixer. The rate of interest which Hall paid on its loan with GMAC varied from approximately 12% to 21%. The trial court specifically did not allow prejudgment interest on the damages incurred by Hall.

Hall's third amended complaint alleged that it terminated the distributor agreement pursuant to the terms of the agreement and the laws of North Dakota (NDCC Ch. 51–07) and that Crane refused to repay it the sum equal to one hundred percent of the net cost of the "current" model trucks held by Hall. Hall's complaint further alleged that as a result of Crane's failure to refund the $174,529.00, Hall incurred interest expenses due on its loan with GMAC in the amount of $56,509.24.

The distributor agreement provided in substance that if Hall terminated the agreement, Crane had the option to repurchase "any or all current model new and unused Crane vehicles." The statutory provisions of NDCC § 51–07–01 contain language to the effect that, in the event either Crane or Hall cancelled or discontinued the distributor agreement, Crane was required to repurchase from Hall the current unused complete trucks for a sum equal to one hundred percent of the net cost.

A general principle of contract law is that existing law at the time of the formation of a contract becomes part of the contract. *E.g., Storbeck v. Oriska School District No. 13,* 277 N.W.2d 130 (N.D.1979). The distributor agreement contained a provision which essentially provided that any provision therein which was contrary to applicable state law was severable from the agreement. Consequently, we conclude that the statutory provisions of NDCC § 51–07–01 must be read into the distributor agreement and any contrary contractual provisions must be severed.

Crane's refusal to pay Hall one hundred percent of the net cost of the four concrete mixers was in violation of NDCC § 51–07–01 and, therefore, was a breach of the distributor agreement. Accordingly, we believe Hall was entitled to recover damages for a breach of contract.

NDCC § 32–03–09 provides as follows:

"For the breach of an obligation arising from contract, the measure of damages, except when otherwise expressly provided by the laws of this state, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which in the ordinary course of things would be likely to result therefrom. No damages can be recovered for a breach of contract if they are not clearly ascertainable in both their nature and origin."

Special damages for the breach of a contract are those which are reasonably within the contemplation of the parties at the time the contract was executed. *Bumann v. Maurer,* 203 N.W.2d 434 (N.D. 1972). The question of whether or not special damages were reasonably within the contemplation of the parties at the time the contract was executed is treated basically as a question of fact. *Id.*

The district court found that "from the time of the distributorship agreement, Crane knew that Hall would be either borrowing money from GMAC Financing, or on a separate credit line with Crane to pay for Hall's inventory of Crane trucks." This finding is not clearly erroneous.

The interest paid by Hall to GMAC on its inventory financing was an expense actually incurred by Hall because of the distributor agreement and was a proper element of damages. In this respect the interest was not prejudgment interest as discussed in

*Hirschkorn v. Severson,* 319 N.W.2d 475 (N.D.1982). Consequently, the rule of law announced in that case pertaining to prejudgment interest is inapplicable to this case.

 Crane alternatively contended that the district court erred in allowing damages in the amount of the interest paid by Hall to GMAC from 60 days after the 22 January 1980 letter of "mutual termination" until each truck was sold. Crane contended that damages should have been computed from 60 days after the 25 February 1980 letter of unilateral cancellation. As Crane pointed out, the letter dated 22 January 1980 by Hall requested "mutual termination" which was declined by Crane. The distributor agreement provided for termination by mutual consent of the parties at any time, or by Hall upon not less than sixty days' written notice to Crane. The letter requesting "mutual termination" was sufficient to put Crane on notice that Hall intended to terminate the distributorship and that any further transactions with Hall should be carefully examined and weighed. But we do not believe the letter satisfied the legal requirements nor did it constitute a unilateral termination of the distributorship so as to trigger the 60-day time period. The distributorship was not legally terminated until the letter of 25 February 1980 unilaterally concluding or terminating the distributorship.

Accordingly, we conclude that the district court erred in allowing damages to accrue beginning 60 days after 22 January 1980. The damages may not begin any sooner than 60 days from 25 February 1980 and the judgment is modified accordingly.

## HALL'S CROSS–APPEAL

Prior to trial, Crane moved to strike allegations in Hall's second amended complaint which, in part, sought damages pursuant to NDCC § 51–07–01.1, and alternatively moved for a partial summary judgment. The trial court concluded that NDCC § 51–07–01.1 was inapplicable in situations where the retailer (Hall) terminated the distributor agreement and granted Crane's motion

because Hall's second amended complaint alleged that it had terminated the distributorship and Crane's amended answer agreed that Hall had terminated the distributorship. The district court entered an order dated 14 December 1981 granting Crane's alternative motion for partial summary judgment. Because of our disposition of the "order for partial summary judgment," we express no comment regarding its designation. Neither do we indicate whether or not the judgment, if one had been entered, would have met the requirements of Rule 54(b), NDR Civ.P.

Crane moved to dismiss the portion of Hall's cross-appeal from the order for partial summary judgment because the appeal was not taken by filing a notice of appeal within 60 days of the notice of entry of order for partial summary judgment as required by North Dakota Rules of Appellate Procedure 4(a).

 Although an interlocutory order is a nonappealable intermediate order, that order may be reviewed if the final judgment is appealed. *Spence v. North Dakota District Court,* 292 N.W.2d 53 (N.D.1980); *Suburban Sales and Service, Inc. v. District Court of Ramsey County,* 290 N.W.2d 247 (N.D.1980); *United Hospital v. Hagen,* 285 N.W.2d 586 (N.D.1979); *Applegren v. Milbank Mutual Insurance Co.,* 268 N.W.2d 114 (N.D.1978).

 In this instance Hall cross-appealed from the final judgment. Consequently, the order which essentially struck a part of Hall's amended complaint is reviewable in Hall's cross-appeal from the final judgment and the language in Hall's notice of appeal to the effect that, in addition to the judgment of 2 August 1982, it was appealing from the order of 14 December 1981 is surplusage.

Hall contended that it was entitled to costs and reasonable attorney's fees pursuant to NDCC § 51–07–01.1 which provides as follows:

"1. Any manufacturer, wholesaler, or distributor of farm implements, machinery, and repair parts therefor, or of auto-

mobiles, trucks, and repair parts therefor, who enters into a contract with any person, firm, or corporation engaged in the business of selling and retailing farm implements and repair parts for farm implements, or in the business of selling and retailing automobiles or trucks or repair parts for automobiles or trucks whereby such retailer agrees to maintain a stock of parts or complete or whole machines or attachments, automobiles, or trucks, shall not terminate, cancel, or fail to renew any such contract with the person, firm, or corporation without good cause.

"2. For the purpose of this section, good cause for terminating, canceling, or failing to renew a contract shall be limited to failure by the person, firm, or corporation in the business of selling and retailing to comply with those requirements imposed by the written contract between the parties. Further, the determination by the manufacturer, wholesaler, or distributor of good cause for such termination, cancellation, or failure to renew must be made in good faith.

"In any action against a manufacturer, wholesaler, or distributor for violation of this section, the manufacturer, wholesaler, or distributor must establish that the termination, cancellation, or failure to renew was made in good faith for good cause as that term is defined in this section. *If the manufacturer, wholesaler, or distributor fails to establish good cause for its action, it shall be liable for all special and general damages sustained by the plaintiff, including, but not limited to, the costs of the litigation and reasonable attorneys' fees for prosecuting the action, and the plaintiff, where appropriate, shall be entitled to injunctive relief.* The provisions of this section shall apply to all contracts now in effect which have no expiration date and are continuing contracts and all other contracts entered into, amended, or renewed after July 1, 1975. Any contract in force and effect on July 1, 1975, which by its terms will terminate on a date subsequent thereto shall be governed by the law as it existed prior to July 1, 1975." [Emphasis added.]

Hall contended that NDCC § 51–07–01.1 should be liberally construed to allow the award of attorney's fees when the dealer (Hall) is forced to prosecute the manufacturer (Crane) under the statute and the manufacturer fails to establish good cause for its action. Hall further contended that the phrase "its action" in subsection 2 of NDCC § 51–07–01.1 should not be strictly construed to mean only a termination by the manufacturer but should include cases such as the instant one.

 The primary purpose of statutory construction is to ascertain the intent of the Legislature. *Morton County v. Henke,* 308 N.W.2d 372 (N.D.1981). The Legislature's intent in enacting a statute must first be sought from the language of the statute. *Apple Creek Township v. City of Bismarck,* 271 N.W.2d 583 (N.D.1978). If a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit because the legislative intent is presumed clear from the face of the statute. NDCC § 1–02–05; *Morton County v. Henke, supra.*

 Attorney's fees are not recoverable in an action unless expressly authorized by statute. *Hager v. Devils Lake Public School District,* 301 N.W.2d 630 (N.D.1981); *Westchem Agricultural Chemicals, Inc. v. Engel,* 300 N.W.2d 856 (N.D.1980); *United Development Corp. v. State Highway Department,* 133 N.W.2d 439, 22 A.L.R.3d 662 (N.D.1965).

 NDCC § 51–07–01.1, through its plain language, speaks only to a situation in which the manufacturer, wholesaler, or distributor terminates the contract and does not pertain to the factual situation in which the retailer terminates the contract. To construe the statute as suggested by Hall would overlook the unambiguous language of the statute and would violate rules of statutory construction.

In this instance the undisputed facts, as set forth in Hall's second amended complaint and Crane's amended answer, re-

flected that Hall terminated the agreement. Because attorney's fees are only as allowed by statute and because of the limited language in NDCC § 51–07–01.1 and the undisputed fact that Hall terminated the agreement, we conclude that the district court properly granted Crane's motion to strike a part of the complaint asking for attorney's fees because § 51–07–01.1 was not applicable.

■ Hall contended that the trial court improperly deducted the reimbursement of 45 days of floor plan interest from its award of damages. The district court found that the agreement between Hall and Crane to exchange the three refuse trucks for the four concrete mixers included an agreement to credit Hall's account for 45 days of floor plan interest; however, Hall's account was never credited for the 45 days of floor plan interest. The district court further found that after Crane had cancelled and then reinstated the order for the four concrete mixers, Hall terminated the distributor agreement and never took physical delivery of the trucks and, therefore, was not entitled to financial assistance from Crane for a physically nonexistent large inventory.

The testimony presented at trial established that a visible inventory facilitated sales. Floor plan financing essentially related to the financing of that inventory. The record suggests that 45-day floor plan financing was part of Crane's ordering plan to permit its distributors to develop an inventory visible to customers. The testimony of Gerald Hall reflected that Crane helped Hall by giving 45 days of free interest if Hall would put certain trucks into inventory, and therefore make Crane vehicles visible to customers. The record supports the finding that Hall did not receive the concrete mixers from Crane.

Although further testimony was not developed in detail at trial, we agree with the district court that Hall was not entitled to reimbursement in the form of floor plan interest for an inventory which it did not physically receive.

Hall also contended that the trial court erred in denying it exemplary damages pursuant to NDCC § 32–03–07.[5]

■ NDCC § 32–03–07 and our case law establish that exemplary damages are ordinarily not recoverable in actions arising under a breach of contract. *E.g., John Deere Co. v. Nygard Equipment, Inc.,* 225 N.W.2d 80 (N.D.1974). Because the instant action arose under a breach of contract and not an independent tort, we do not believe the trial court erred in denying exemplary damages to Hall.

■ Hall also contended that it was entitled to prejudgment interest upon its damages at the legal rate of six percent. See, NDCC § 47–14–05.

NDCC § 32–03–04 provides as follows:

"Every person who is entitled to recover damages certain or capable of being made certain by calculation, the right to recover which is vested in him upon a particular day, also is entitled to recover interest thereon from that day, except for such time as the debtor is prevented by law or by the act of the creditor from paying the debt."

In *Metcalf v. Security International Insurance Co.,* 261 N.W.2d 795, 802 (N.D. 1977), we said:

"If a claim for breach of contract is uncertain, unliquidated, and disputed, interest should not be awarded to the plaintiff prior to the entry of the judgment by which the amount due for the breach is determined. *North American Pump Corp. v. Clay Equipment Corp.,* 199 N.W.2d 888 (N.D.1972). However, the fact that a defendant disputes the sum owed does not, in itself, render the plaintiff's claim uncertain or unliquidated so as to deny the plaintiff interest under

5. NDCC § 32–03–07 provides as follows:

"In any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant."

§ 32–03–04, N.D.C.C. *Stee v. "L" Monte Industries, Inc.*, 247 N.W.2d 641 (N.D. 1976)."

In this instance, the interest rate on Hall's loan with GMAC for the inventory financing for the four concrete mixers fluctuated between 11¾% and 21¾%. Additionally and more importantly, the *date of sale of each mixer* was indefinite. We believe these factors preclude Hall from prejudgment interest on its special damages for the period of time between the termination of the distributor agreement (60 days after 25 February 1981) and the dates when Crane issued checks payable to GMAC (11 August 1981, 5 November 1981, 24 November 1981) (see fn. 2.), or the date when Hall sold the concrete mixer (16 December 1981).

However, during the period of time after Crane issued checks to GMAC (11 August 1981, 5 November 1981, and 24 November 1981) and until judgment was entered (2 August 1982), the amount of interest on the inventory financing paid on each mixer was certain, and Hall was entitled to prejudgment interest on that amount at the legal rate. Consequently, we remand for the limited purpose of calculating prejudgment interest on the damages (interest on Hall's loan with GMAC on each mixer) for the time period after Crane issued the checks to GMAC (11 August 1981, 5 November 1981, and 24 November 1981) or Hall sold the mixer (16 December 1981) and until entry of judgment and to modify the judgment to allow damages only from 60 days after 25 February 1980 instead of 22 January 1980.

The judgment in all other respects is affirmed.

ERICKSTAD, C.J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.