**Dennis E. HOGE and James L. Hoge,
Plaintiffs and Appellees,**

v.

**The BURLEIGH COUNTY WATER MAN-
AGEMENT DISTRICT, a public corpo-
ration, Defendant and Appellant.**

**Civ. No. 9948.**

Supreme Court of North Dakota.

Oct. 9, 1981.

Zuger & Bucklin, Bismarck, for plaintiffs and appellees; argued by Robert V. Bolinske, Bismarck.

Lundberg, Conmy, Nodland, Lucas & Schulz, Bismarck, for defendant and appellant; argued by Robert H. Lundberg, Bismarck.

Michael A. Dwyer, Asst. Atty. Gen., North Dakota State Water Commission, Bismarck, amicus curiae.

ERICKSTAD, Chief Justice.

The Burleigh County Water Management District (Water Management District) has appealed to this court from a judgment of the District Court of Burleigh County. The district court ordered the Water Management District to pay damages, including attorneys' fees, in the amount of $14,293.48 to Dennis E. and James L. Hoge (Hoges) for damages to their property which resulted from flood water in April 1979, and the design and construction of the Burnt Creek Flood Control project. That project was designed and constructed cooperatively by the Water Management District and the United States Soil Conservation Service. The district court held that the Hoges proved their damages and were entitled to recovery for those damages because of an indemnity clause in the deed of property from the Hoges to the Water Management District. Additionally, the district court held that an act of God was not the sole proximate cause of the damages to the Hoges' property, and, therefore, the Water Management District's defense of an act of God failed. We affirm the district court's judgment.

Burnt Creek is a stream beginning in the Wilton area of north Burleigh County which meanders in a southerly direction, then turning southwesterly and entering the Missouri River bottom land approximately five miles north of Bismarck. The stream is confined in relatively high banks, especially toward the southerly end. The Missouri River bottom land upon which it enters has a flat topography. The stream, after it reaches the Missouri River bottoms, has a small carrying capacity. This small carrying capacity has caused almost annual flooding on the bottom land. Because the Missouri River bottom lands slope gently to the south, water frequently spreads over a large area south, west, and north of the point where Burnt Creek enters the bottom land, causing damages to homes and property.

To help alleviate this condition the defendant, Water Management District, and the United States Soil Conservation Service cooperatively determined that a flood control project should be built. The project was designed by the United States Soil Conservation Service and construction began in October 1975. The project was completed in October 1976. Land was needed from various landowners, including the Hoges, for the construction. The Hoges

lived directly west of the project. Their land was bounded on the west by the Missouri River and on the east by an old Missouri River channel, creating an island. The Hoges are farmers raising cattle and grain.

The Water Management District obtained a deed of certain lands belonging to the Hoges in May of 1975. That deed contained the following indemnity clause:

"The party of the second part hereby agrees to indemnify and to hold and save the parties of the first part harmless from any and all damages to their lands not conveyed herein in fee arising from the use of the rights, easement and right-of-way herein granted, and agrees to pay any damages which may arise to the parties of the first part's property through the use, occupation and possession of the rights herein granted by the party of the second part."

It is this indemnity clause which is the basis for the Hoges' recovery.

The project, as designed by the United States Soil Conservation Service, and built jointly by the Service and the Water Management District, provided for a floodway to carry the excess waters of Burnt Creek west from where the creek entered the Missouri River bottom land to the old Missouri River channel on the east side of the Hoges' land. Embankments were put up along the floodway to protect the land to the south from a 100-year flood. The embankment along the north side of the floodway was built to protect against a 25-year flood. The reason given for this variance in protection was that the area to the south had suffered more frequent flooding than the area to the north and economics precluded a more extensive project for the north area. Embankments were raised along the east edge of the Hoges' land (and just west of the old Missouri River channel) to protect the Hoges' land from flooding to a 25-year flood frequency. The embankment on the east edge of the Hoges' land was tied into a dike previously built by the Hoges along the western edge of their land, adjacent to the Missouri River and down to the point where

the old Missouri River channel joins the river itself.

In April of 1979, there was a flood in the floodway area and the Hoges' land was inundated with water. They suffered extensive damage to their roads, crops, and machinery, and lost many calves due to the water being impounded on their land by the dikes.

The Missouri River flows to the west of Hoge Island. The river was flowing within its banks during and after the flood.

The Hoges contend they are entitled to recovery under the indemnity provision of their agreement with the Water Management District because the flood control project was inadequately designed, causing more water to flow north and onto their land than would ordinarily be the case. They argue that the water from the area drained into the floodway and the floodway acted as a water hose shooting water at and over the 25-year frequency dike on the north side of the old Missouri River channel. Their argument continues that once on their land the water was then trapped by the diking in the southwest corner of their land where the old Missouri River channel meets the Missouri River. Because they believe the floodway project was responsible for the damage to their land, the Hoges contend that natural forces were not the sole proximate cause of their damages and, therefore, that the Water Management District's defense of an act of God must fail. Similar arguments were made before the trial court. It agreed with the Hoges and issued findings of fact, conclusions of law, and order for judgment consistent therewith.

The Water Management District contends that the trial court's findings of fact are "clearly erroneous." It argues that the damage to the Hoges' property was caused by an accumulation of an unusual amount of snowfall in the Burnt Creek basin coupled with an unseasonably high temperature which, acting in concert, caused an unprecedented rush of water through the area. The Water Management District therefore relies on the defense that the

Hoges' damages were caused by an act of God, arguing that the natural forces were the sole proximate cause of the damage to the Hoges' property. The Water Management District contends further that the deed in question did not unqualifiedly obligate them to indemnify the Hoges for damages to their land.

We conclude that the district court's findings that the flood control project contributed to the damage caused to the Hoges' land and that the Hoges are entitled to recovery because of the indemnity clause contained in the deed to the Water Management District are not "clearly erroneous." The defense that the flooding was caused by an act of God, therefore, fails. Because the Water Management District's liability arises out of the indemnity agreement, we do not address the issue of whether or not the Water Management District was negligent in the design or construction of the project.

The first issue for this court to address is whether or not the indemnity agreement between the Hoges and the Water Management District imposes liability on the Water Management District for losses suffered by the Hoges. The question presented is one of construction of a contract. Construction of a written contract to determine its legal effect is always a question of law for the court to decide. *Hager v. Devils Lake Public School District*, 301 N.W.2d 630, 633 (N.D.1981). On appeal to this court, the conclusions of law are fully reviewable. *Id.* at 633.

The contract of indemnity is construed in accordance with the rules for construction of contracts generally. *First Trust Company of Lincoln v. Airdale Ranch and Cattle Company*, 136 Neb. 521, 286 N.W. 766, 772 (1939). When interpreting indemnity contracts, therefore, as with contracts generally, the cardinal rule is that the contract must be interpreted to give effect to the mutual intentions of the parties if it can be done consistently with legal principles. *Hager v. Devils Lake Public School District*, 301 N.W.2d at 633; *Title Guaranty & Surety Co. v. Roehm*, 215 Mich.

586, 184 N.W. 414, 415 (1921); § 9–07–03, N.D.C.C.

The Water Management District contends that the intent of the paragraph was to indemnify the Hoges if the dikes were defectively constructed and washed away, causing water to flow and damage the Hoge property. It argues that the wording of the indemnity provision does not extend to the entire project, but is strictly limited to damages caused only on the lands conveyed by the Hoges.

The Hoges counter by saying the intent of the parties can be gleaned by a plain reading of the agreement. That intent, they claim, was that in the event the Hoges were in *any* way damaged, the Water Management District would indemnify them and hold and save them harmless from *any* and *all* such damage. They contend that the indemnity provision was an integral part of the agreement and that the agreement would likely not have been entered into had the indemnity feature been left out. They conclude that the indemnity agreement was for the protection of the Hoges and was designed to insure that they, themselves, suffered no loss because of their willingness to allow some of their property to be used for the protection of property belonging to others.

When a contract is reduced to writing, as in the instant case, the intention of the parties is to be ascertained from the writing alone, if possible. § 9–07–04, N.D.C.C. In determining whether or not the trial court erred as a matter of law in its construction of the contract we must be guided first by the language of the contract itself, and where the contract is clear and unambiguous there is no reason to go further. *Hager v. Devils Lake Public School Dist.*, 301 N.W.2d at 633; *Automatic Canteen Company of America v. Butler*, 177 So.2d 712, 715 (Fla.Dist.Ct.App.1965).

The question before us, then, becomes: Did the language of the indemnity clause evidence an intent by the parties that in the event the Hoges were in *any* way damaged by the construction of the

flood control project, the Water Management District would indemnify them *any* and *all* such damage? We agree with the trial court that a plain reading of the indemnity clause indicates such an intention. The indemnity agreement was for the protection of the Hoges and was designed to insure that they would not suffer any loss because of the construction of the dikes. The Hoges did suffer damages as a result of the flood control project construction which forced water onto their land and trapped it there. The Hoges are therefore entitled to indemnity from the Water Management District for those damages.

The Water Management District next contends that even if the Hoges are entitled to recovery by virtue of the indemnity clause, such recovery is precluded because the damage to the Hoges' land resulted solely from an act of God.[1] The trial court concluded that the act of God defense was not established by clear and convincing evidence.

The issue of whether or not the Water Management District sustained its act of God defense presented several questions of fact relating to whether or not each necessary element of that defense had been established. The district court found that the Water Management District failed to prove any of the necessary elements.

The scope of our review of those findings is limited. Rule 52 of the North Dakota Rules of Civil Procedure relating to findings of fact made by a court sitting without a jury provides in relevant part: "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." This court has many times commented on that standard. In *George v. Compson*, 251 N.W.2d 743, 745–46 (N.D.1977), we said:

"Our standard of review of a district court's finding of fact is *not*, however, a redetermination of the weight of the evidence. Preponderance of the evidence is not what we seek to find. We are limited by Rule 52(a), N.D.R.Civ.P., to setting aside a finding of fact only when it is clearly erroneous. . . .

"We have often stated that a finding of fact is clearly erroneous only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made; and that the mere fact that the appellate court might have viewed the facts differently, if it had been the initial trier of the case, does not entitle it to reverse the lower court. *E. g., Mattco, Inc. v. Mandan Radio Ass'n, Inc.*, 246 N.W.2d 222 (N.D.1976); *Berry-Iverson Co. of North Dakota v. Johnson*, 242 N.W.2d 126 (N.D. 1976); *Larson v. Larson*, 234 N.W.2d 861 (N.D.1975)."

■ The trial court's findings are to be given the same weight as a jury verdict and, in reviewing those findings, the evidence must be viewed in a light most favorable to the findings. *Eakman v. Robb*, 237 N.W.2d 423, 429 (N.D.1975). On appeal it is not the function of this court to substitute its judgment for that of the trial court. *Rolfstad v. Hanson*, 221 N.W.2d 734, 737 (N.D.1974). We must give due regard to the opportunity of the trial court to judge the credibility of witnesses, and, unless clearly erroneous, the findings of fact of the trial court, sitting without a jury, are binding upon appeal. *Tower City Grain Co. v. Richman*, 232 N.W.2d 61, 65 (N.D.1975). Questions of fact decided by the trial court upon conflicting evidence are not subject to reexamination by this court. *Bladow v. Bladow*, 249 N.W.2d 917, 920 (N.D.1977). The mere fact that we might have viewed the facts differently if we had been the initial trier of the case does not entitle us to reverse the lower court. *In Re Estate of Elmer*, 210 N.W.2d 815, 820 (N.D.1973).

1. There is a possibility that the defense of act of God was implicitly waived by the indemnity agreement between the parties. We do not, however, address that issue in this case because it was neither raised nor argued by the parties. Additionally, we find no need to raise it on our own motion because of our decision that the act of God defense fails.

We hold that the trial court's findings of facts were not "clearly erroneous" and therefore affirm its conclusion that the Water Management District did not prove that the act of God was the sole proximate cause of the flooding and consequent damage to the Hoges.

We set out the elements of the act of God defense in the case of *Dempsey v. City of Souris*, 279 N.W.2d 418, 421 (N.D.1979). In that case, the plaintiff sought recovery for damages caused by the overflow of defendant's lagoon onto the plaintiff's land. Defendant, the City of Souris, raised the act of God defense. We stated:

> "In order to prevail in the present case using the act of God defense, the City was required to prove that the rainfall, runoff, and flooding were unprecedented and extraordinary and could not have been reasonably anticipated and provided against. [Citations omitted.] In addition, the City was required to prove that an act of God was the *sole proximate cause* of the damage to the Dempseys' land. [Citations omitted.]" [Emphasis added.] 279 N.W.2d at 421.

We then quoted from a Minnesota Supreme Court decision, *National Weeklies, Inc. v. Jensen*, 183 Minn. 150, 235 N.W. 905, 906 (1931), as follows:

> " 'If the damage done was solely the result of an act of God, the city was not liable. If the negligence of the city approximately contributing and an act of God combined to produce the result, the city is liable.' " 279 N.W.2d at 421.

We noted that the City of Souris had the burden of proving that the conditions constituted an act of God. We then stated:

> "In the present case, the district court found that the damage to the Dempseys' land had been caused by several factors, including excessive rainfall and runoff; the discharge of untreated sewage; and flooding, which resulted from the excessive rainfall and runoff. The district court's finding that several factors had combined to cause the damage implicitly precluded a finding that an act of God had been the sole proximate cause of the

damage. Because an act of God was not the sole proximate cause of the damage, the City of Souris could not successfully assert the act of God defense to avoid liability." 279 N.W.2d at 421.

Thus, to meet its burden of proof and prevail on the act of God defense, the Water Management District had to establish by a preponderance of the evidence that (1) the flooding was unprecedented and extraordinary, (2) the flooding could not have been reasonably anticipated, (3) the flooding could not have been reasonably provided against, and (4) the act of God was the sole proximate cause of the damage to the plaintiffs.

The North Dakota State Engineer in his amicus curiae brief urged this court to conclude that findings of the trial court were "clearly erroneous" because, he asserted, the Water Management District was not negligent in the planning, design, or construction of the Burnt Creek Flood Control Project. His assertion related to the third element of the act of God defense; that the flooding could not have been reasonably provided against.

The Water Management District had the burden of proof on each element of the act of God defense. Failure to meet that burden on any element defeats the defense. We therefore consider only whether or not the alleged act of God was the sole proximate cause of the Hoges' damages. The trial court found that the flood control project contributed to the damages suffered by the Hoges. We conclude that its finding on this element was not "clearly erroneous" and that it is dispositive of the act of God issue. We therefore do not address the issue of whether or not the Water Management District was negligent in the design or construction of the flood control project.

In concluding that the trial court's finding that natural forces were not the sole proximate cause of the Hoges' damages is not "clearly erroneous", we are not unmindful of testimony that a significant amount of water flowed through the Burnt Creek Basin during the 1979 flood. Robert Barnicle, hydrologist for the United States

Weather Service in Bismarck, indicated that the snowfall during the winter of 1979 was 150 percent of normal at Wilton. Temperatures remained unusually cold through the spring of 1979, the ground remained frozen and the snow went through a "ripening" process by which it diminished in height but not in water content. On April 18, 1979, the weather changed dramatically. The temperature rose to 69 degrees in Wilton and the wind, from the south, gusted to 49 miles per hour. The result of these conditions was that the entire snowpack melted in a period of one day and, with the ground still frozen, the water was diverted down Burnt Creek.

Notwithstanding the severity of the flood waters, the evidence demonstrates that many factors combined to cause the flooding, and this precludes, as it did in *Dempsey v. City of Souris*, 279 N.W.2d 418 (N.D. 1979), a finding that an act of God was the sole proximate cause of the damages.

The Water Management District contends, and there is testimony to support its contentions, that much of the water was drained onto the Hoges' land because of the reconstruction of Highway 1804, approximately one-half mile east of the Hoges' land. The testimony shows that at about the same time as the flood control project was being constructed, Burleigh County rebuilt Highway 1804 and built a bridge over Burnt Creek. That bridge became the starting point of the floodway constructed by the Water Management District. In rebuilding the highway, Burleigh County straightened it and raised its elevation. The greatest rise in elevation was to the south of the Burnt Creek bridge. The Water Management District asserts that the higher elevation of the highway to the south dammed water draining from the eastern high lands and channeled it north. It further contends this caused the water to cross over the highway north of Burnt Creek bridge, which is also north of the flood control project, and, once over the highway, the water flowed west about one-half mile directly onto the Hoges' property unaffected by the flood control project.

The trial court found that the flood waters "were diverted from their usual southerly flow by the floodway" and were sent west over the 25-year frequency dike *at a point where the floodway and the dike form a "T" and at a point north of the floodway.* The testimony discussed above supports the finding that the water entered the Hoges' land north of the floodway. There is also testimony to support the court's finding that the flood waters were diverted from their usual southerly flow by the floodway and were sent west over the 25-year frequency dike, entering the Hoges' land at the point where the floodway and the dike form a "T".

While the evidence relative to the reconstruction of the highway explains partially how the flood water may have flowed onto the Hoges' land, it does not require a finding that the flood control project did not contribute proximately to the Hoges' damages.

Engineer Edward Hagen, a consulting engineer with the firm of Swenson and Hagen, testified that the dike in the southwest corner of the Hoges' property performed two functions. First, it functioned as a dike preventing water from entering the Hoges' land through the southwest corner. Secondly, however, it also functioned as a dam preventing the floodwaters, once on the Hoges' land via the northern route, from exiting. He testified that the dam/dike as constructed would back up water to a depth of two and one-half feet in the Hoges' calving area before water could escape the Hoges' property by running over the top of the dike. Hagen said that it was sound engineering practice to design a safety valve into any project of this type and that had not been done in this case. He said that a larger drainage facility could have been constructed in the area where the water, fighting to get out of the Hoges' land, broke through the dike. The drainage facility, he testified, could have been in the form of a manually-operated sluice gate which would let water out as it was impounded and would consequently prevent the back-up effect which inundated the Hoges' fields and calving area.

Charles Muma, an agent of the soil conservation service, testified that without the floodway project there would have been a wall of water rushing into the lowlands on the south side of the floodway, to the south and east of the Hoges' land. This further supports the trial court's finding that the floodway project pointed the water at the Hoges' land and, once on their land, the water was prevented by the dikes from flowing south and exiting into the Missouri River. We conclude that, irrespective of any effect the highway may have had, the trial court was not in error in concluding that the Water Management District was liable.

■ The next issue for this court to address is whether or not the Hoges should be awarded attorneys' fees. The Hoges contend that they are entitled to attorneys' fees under their indemnity agreement with the Water Management District. The Water Management District, on the other hand, contends that the Hoges are not entitled to attorneys' fees because the Hoges made changes in the indemnity clause, thereby making that provision their own. Such a provision, argues the Water Management District, should be construed liberally against the authoring party. Because attorneys' fees were not specifically mentioned in the indemnity provision, the Water Management District contends that the parties did not intend attorneys' fees to be included in an award of damages.

■ The general rule in North Dakota is that in the absence of any contractual or statutory liability, attorneys' fees incurred by a plaintiff in the litigation of his claim are not recoverable as an item of damages, either in an action ex contractu or an action ex delicto. *Baldus v. Mattern*, 93 N.W.2d 144, 149 (N.D.1958). In *Baldus*, we explained the reason for not awarding attorneys' fees as follows:

"The reason usually assigned for the imposition of this rule is that these expenses are not a legitimate consequence of the tort or breach of contract; that to allow these expenses to a plaintiff which are never allowed to a successful defendant,

would give the former an unfair advantage in the context; that where the statute provides that the successful party may be allowed certain sums, termed 'costs' by way of indemnity for his expenses in the action, it is not in the power of the court or jury to increase the allowance fixed by statute, however inadequate the allowance may be. *Stickney v. Goward*, 161 Minn. 457, 201 N.W. 630, 639, 39 A.L.R. 1216." 93 N.W.2d at 149–50.

The statutory rule concerning an award of attorneys' fees in North Dakota is found at Section 28–26–01, N.D.C.C., which reads in relevant part: "[T]he amount of fees of attorneys in civil actions must be left to the agreement, *express or implied*, of the parties." (Emphasis added.)

In the instant case, the intent of the parties is clear. The Water Management District obtained a part of the Hoges' land and an easement as to another part of their land for the purpose of constructing a flood control project. Most of the land which had been flooded on an annual basis, and for which the flood control project was primarily designed to protect, was located south of the Hoges' land. It was therefore the intent of the parties, as is apparent from their agreement, that in the event the Hoges were in *any* way damaged, the Water Management District would indemnify them and hold and save them harmless from *any* and *all* such damages.

The Hoges suffered damages to their land and other property in 1979 as a result of the flood control project. Rather than being indemnified and immediately paid for the losses they sustained as was the intent of the parties when they entered into the agreement, the Hoges had to commence this lawsuit, wait for it to be heard, and spend considerable money on attorneys' fees to pursue recovery of their losses. The essence of the indemnity agreement was protection to the Hoges from losses arising from the flood control project. We therefore hold that, although not expressly included in the indemnity agreement, attorneys' fees were implied. To hold otherwise

would dilute their recovery and be contrary to the spirit of the indemnity agreement which was designed to pay the Hoges for *all* losses they incurred.

■ The rationale justifying attorneys' fees in the trial court in this case justifies attorneys' fees on appeal. We have previously recognized that an award of attorneys' fees on appeal may be appropriate. In *Skrove v. Heiraas*, 303 N.W.2d 526, 533 (N.D.1981), we said:

> "Skrove has requested this court to award attorney fees to him for the appeal. His argument is that if we do not award attorney fees on appeal we will dilute his recovery. That position is realistic and is substantiated by case law cited by Skrove. See *Montalvo v. Tower Life Building*, 426 F.2d 1135 (5th Cir. 1970). But, because we have reduced the award to Skrove by the $300 exemplary damages without reducing the attorney fees awarded to him by the trial court, we do not award additional fees to him on this appeal."

*Skrove* involved recovery of underpaid wages and the interpretation of a federal statute which superseded North Dakota's statute. What is pertinent here is the principle of nondilution of recovery which the case enunciates. Agreeing therewith, we affirm the district court's award of attorneys' fees and remand the case to the district court for a determination of reasonable attorneys' fees in conjunction with this appeal.

Affirmed.

VANDE WALLE and PEDERSON, JJ., and O'KEEFE and BAKKEN, District Judges, concur.

O'KEEFE and BAKKEN, District Judges, sitting in place of PAULSON and SAND, JJ., disqualified.