MINEX RESOURCES, INC., Plaintiff
and Appellant,

v.

Robert MORLAND, Special Administrator of the Estate of Kathleen O'Connell, Defendant, Third–Party Plaintiff and Appellee,

v.

PATRICK PETROLEUM COMPANY, a foreign corporation, and Petrotech, Inc., a foreign corporation, Third–Party Defendants.

MINEX RESOURCES, INC., Plaintiff,

v.

Robert MORLAND, Special Administrator of the Estate of Kathleen O'Connell, Defendant, Third–Party Plaintiff and Appellant,

v.

PATRICK PETROLEUM COMPANY, a foreign corporation, Third–Party Defendant and Appellee,

and

Petrotech, Inc., a foreign corporation, Third–Party Defendant.

MINEX RESOURCES, INC., Plaintiff,

v.

Robert MORLAND, Special Administrator of the Estate of Kathleen O'Connell, Defendant and Third–Party Plaintiff,

v.

PATRICK PETROLEUM COMPANY, a foreign corporation, Third–Party Defendant and Appellee,

and

Petrotech, Inc., a foreign corporation, Third–Party Defendant and Appellant.

MINEX RESOURCES, INC., Plaintiff,

v.

Robert MORLAND, Special Administrator of the Estate of Kathleen O'Connell, Defendant, Third–Party Plaintiff and Appellee,

v.

PATRICK PETROLEUM COMPANY, a foreign corporation, Third–Party Defendant and Appellant,

and

Petrotech, Inc., a foreign corporation, Third–Party Defendant.

MINEX RESOURCES, INC., Plaintiff,

v.

Robert MORLAND, Special Administrator of the Estate of Kathleen O'Connell, Defendant, Third–Party Plaintiff and Appellant,

v.

PATRICK PETROLEUM COMPANY, a foreign corporation, Third–Party Defendant,

and

Petrotech, Inc., a foreign corporation, Third–Party Defendant and Appellee.

Civ. Nos. 900176, 900213, 900214, 900215 and 900235.

Supreme Court of North Dakota.

March 19, 1991.

 
 
 
 
 

 

 
 
 
 
 
 

 
 
 

 
 
 
 
 

 
 
 

 

 
 
 

 

 
 
 

 

Michael J. Maus (argued), of Howe, Hardy, Galloway & Maus, P.C., Dickinson, for plaintiff and appellant.

James D. Geyer (argued), of Mackoff, Kellogg, Kirby & Kloster, P.C., Dickinson, for defendant, third-party plaintiff, appellee and appellant Robert Morland, Sp. Administrator of the Estate of Kathleen O'Connell.

Eugene F. Buresh (argued), of Freed, Dynes, Reichert & Buresh, P.C., Dickinson, for third-party defendant, appellee and appellant Patrick Petroleum Co.

David F. Senn (argued), of Baird & Senn, Dickinson, for third-party defendant, appellant and appellee Petrotech, Inc.

MESCHKE, Justice.

Minex Resources, Inc. sued the Estate of Kathleen O'Connell [1] for breach of warranty in a personal representative's deed, seeking $14,533.64 and future operating expenses for that portion of the working interest in an oil and gas well located in Billings County, which the Estate had sold and conveyed to Minex in 1983. The Estate brought third-party claims against Patrick Petroleum Company and Petrotech, Inc. seeking indemnity. Patrick counterclaimed against the Estate for reimbursement of the Estate's share of working-interest expenses that Patrick claimed to have mistakenly paid after completion of the oil well. Petrotech cross-claimed against Patrick seeking indemnity, including attorney fees, through the agreement by which Patrick assigned its working interest in the well to Petrotech. After a trial without a jury, the trial court dismissed Minex's claim against the Estate, the Estate's third-party claim against Patrick and Petrotech, Patrick's counterclaim against the Estate, and Petrotech's cross-claim against Patrick. Each party appealed from the judgment dismissing their respective claim. We reverse and remand for further proceedings.

On August 7, 1978, Kathleen O'Connell and her husband, Maurice O'Connell, leased her undivided ³⁄₁₆ths mineral interest in two sections of land to Patrick for oil and gas development. By virtue of this lease, Kathleen retained a landowner's royalty and Patrick obtained an undivided 18.75 percent working interest in those sections.

On the same day, Patrick entered into a separate letter agreement with Kathleen and Maurice, agreeing in part:

Prior to commencement of operations for the drilling of a well for oil or gas on the lands covered by the Lease, Patrick shall execute and deliver to you an assignment in the form attached hereto as Exhibit "C" of a working interest affecting all of the lands covered by the Lease equal to one-quarter of the oil and gas mineral interest which you then own in and to the lands covered by the Lease, which assignment will be without covenant or warranty of title either express or implied except as to persons claiming by, through or under Patrick. The assignment will not impair your right to receive the landowner's royalty agreed to be paid under the Lease. At the same time both of you and Patrick shall enter into a Joint Operating Agreement on the form attached hereto as "Exhibit B" and by this reference made a part hereof (herein referred to as the "Joint Operating Agreement"). All operations on the Lease shall be conducted pursuant to the terms of the Joint Operating Agreement except that, notwithstanding anything in the Joint Operating Agreement to the contrary, Patrick shall be responsible for and pay all costs associated with drilling and abandoning or completing the first oil and gas well drilled on the lands covered by the Lease. The costs so payable by Patrick will include, but not be limited to, those required to plug, abandon and reclaim a dry hole and those required to render it capable of production, including installation of storage tanks, in the case of a producing well.

On January 9, 1979, Patrick made the assignment required by the letter agreement,

---

**1.** After judgment in this case, the originally appointed personal representative of the Estate, Allan K. Rustan, died. Thereafter, Robert Morland was named Special Administrator of the Estate and was substituted as party defendant.

thus transferring to Kathleen an undivided 4.6875 percent working interest in the property. On April 12, 1979, the first producing oil and gas well was completed on the property. The well was named the Mosser 1–26.

On May 30, 1980, the O'Connells assigned an undivided ⅛th interest in the oil and gas lease to another, leaving Kathleen with an undivided 2.34375 percent working interest in the Mosser 1–26. On June 25, 1980, Kathleen signed the joint operating agreement that listed her as owning an undivided 2.34375 percent working interest in the Mosser 1–26. The well reached payout status on December 1, 1982.

On March 15, 1983, Kathleen and Maurice were murdered. *See State v. Huber*, 361 N.W.2d 236 (N.D.1985). Allan K. Rustan was appointed personal representative of Kathleen's estate and a notice to creditors was first published on May 5, 1983. Because the estate needed cash to pay state and federal taxes, Rustan sought to sell estate assets, including working interests in six wells, one of which was the Mosser 1–26.

Minex became interested in purchasing these interests after reviewing a prospectus prepared by Lee Gerhard, a Colorado oil and gas consultant. The prospectus described working "expenses paid" for the Mosser 1–26 well. Minex offered to purchase these interests for $125,000.

On August 23, 1983, Rustan executed a personal representative's deed conveying to Minex:

> Grantor's working interest, from the surface of the earth to 100 feet below the stratigraphic equivalent of the total depth reached in the Mosser 1–26 well, in six producing oil and gas wells located in Sections 25 and 26, Township 141 North, Range 101 West, 5th P.M., described as follows:

| Well Name | Operator | Net Revenue Interest | Working Interest |
|---|---|---|---|
| Mosser 1–26 | Jerry Chambers Exp. | 1.904295% | –0–* |

* Grantor's share of costs on Mosser 1–26 are paid by the operator.

> Grantor warrants to Grantee all of said property against every person lawfully claiming the same.

In the meantime, Patrick had assigned its working interest in the oil and gas lease to Petrotech on August 8, 1983.

At that time, Amex Resources Incorporated was handling the accounting and billing of working interest expenses on Mosser 1–26. Amex billed the Estate for its share of the August, September, and October, 1983 operating expenses for the well. When the Estate complained, Amex investigated and, relying on representations by Patrick that it was obligated to pay the Estate's share, Amex changed the billing to Patrick's assignee, Petrotech. Petrotech paid that portion of the operating expenses until April 4, 1984, when it wrote the well operator, Jerry Chambers Exploration, directing that the Estate's share of working interest expenses be billed to Minex. Until then, all of Kathleen's share of working-interest expenses had been paid, first by Patrick and later by Petrotech.

In September 1986, the operator of the well, Jerry Chambers Exploration, sued Minex and Petrotech to determine which one was responsible for Kathleen's share of the working-interest expenses. Minex, proceeding pro se through its president, attempted to bring a third-party action against the Estate, but was unsuccessful when the Estate resisted the attempt. On April 11, 1988, Jerry Chambers Exploration obtained a summary judgment declaring that, under the terms of the August 7, 1978, letter agreement, the undivided 2.34375 percent working interest now owned by Minex was to be paid by Patrick only until the Mosser 1–26 was "completed to productive status." This judgment further declared that after the well was completed, Minex, as the successor in interest of Kathleen's estate, was obligated to pay the operating expenses. Judgment was entered against Minex for $14,533.64, its share of operating expenses "since payout." Minex was ordered to pay "any and all future operating expenses attributable to its working interest."

Minex then sued the Estate for $14,-533.64 and for reimbursement of all future

operating expenses attributable to Kathleen's working interest in the Mosser 1–26 well. Minex alleged that the Estate breached representations and warranties in the personal representative's deed. The Estate brought third-party claims against Patrick and Petrotech, requesting that they be substituted as defendants in Minex's main action or, alternatively, that they indemnify the Estate if Minex recovered against it. Patrick counterclaimed against the Estate for reimbursement of the Estate's share of working-interest expenses that Patrick claimed to have mistakenly paid after completion of the well and before assignment of its interest to Petrotech. Petrotech cross-claimed against Patrick for indemnity and attorney fees based upon a clause in its assignment requiring Patrick to save Petrotech harmless from any claims resulting from acts or omissions occurring prior to August 9, 1983.

After trial without a jury, the trial court ruled that Minex was responsible for payment of expenses after completion of the well. The trial court concluded that the Estate had breached no warranty in the personal representative's deed and dismissed Minex's claim. Because the main action was dismissed, the trial court also dismissed the Estate's third-party claim against Patrick and Petrotech.

The trial court dismissed Patrick's counterclaim against the Estate for reimbursement of the Estate's share of working-interest expenses, concluding that the claim was barred by NDCC 30.1–19–03 (UPC 3–803), the non-claim provisions of the probate code. The trial court also dismissed Petrotech's cross-claim against Patrick for indemnity and attorney fees because the Estate's third-party action had been dismissed and because "Petrotech failed to meet its burden of proof on the issue of attorneys fees." All parties appealed.

### Minex vs. The Estate

■ The trial court interpreted the personal representative's deed to place responsibility on Minex for payment of an appropriate share of operating expenses after the completion and payout of the Mosser 1–26. Although extrinsic evidence had been received on the meaning of the deed, the trial court ruled that, because neither party asserted that the deed was ambiguous, the parol evidence rule barred use of extrinsic evidence to determine the meaning of the deed. Instead, the trial court relied on a treatise definition of "net revenue interest" [2] to support its decision and concluded that the phrase, " *Grantor's share of costs on Mosser 1–26 are paid by the operator," did not constitute "a representation that the net revenue interest will be free of such costs in the future." We believe that the trial court mistakenly con-

---

2. The trial court relied on 8 H. Williams and C. Meyers, *Oil and Gas Law Manual of Oil and Gas Terms,* at pp. 601–602 (1987), which defines "net revenue interest" as follows:

(1) A term which has been used to describe a share of the working interest not required to contribute to, nor liable for, any portion of the expense of drilling and completing the initial well on the premises.

(2) This term has also been employed in reference to the lessee's share of production after satisfaction of all royalty, overriding royalty, oil payments, or other nonoperating interests. Thus, if a lease is burdened by a 1/8th royalty and a 1/8th of 8/8ths overriding royalty, the net revenue interest of the lessee is 6/8ths of production. See Scott, "How to Prepare an Oil and Gas Farmout Agreement." 33 *Baylor L. Rev.* 63 at 73 (1981).

(3) The share of unit production attributable to an interest bound by the unit agreement. See, *e.g., Gillring Oil Co. v. Hughes,* 618 S.W.2d 874, 71 O. & G. R. 415 (Tex.Civ.App. 1981) (contributor of 25 net acres to 320–acre unit providing for 25 percent royalty has a net revenue interest of $^{25}/_{320}$ of 25 percent, *viz.,* 1.9531 percent, owner of 6.23 percent of the working interest in the unit acreage has a net revenue interest of 6.23 percent of the 75 percent attributable to the working interest under the agreement, *viz.,* 4.6725 percent).

(4) An interest either decimal or percentage (usually decimal), in a revenue stream, net of all other interests burdening that stream. Where a lessor executes a lease with a one-eighth royalty, the lessor's net revenue interest is 0.125, and the lessee's net revenue interest is 0.875. If the lease is assigned reserving a one-sixteenth overriding royalty, the lessor's net revenue interest is 0.125, the overriding royalty owner's net revenue interest is 0.0625, and the WORKING INTEREST (*q.v.*) owner's net revenue interest is 0.8125.

cluded that it could not consider extrinsic evidence of the intention of the parties to the personal representative's deed.

▋ Documents that convey oil and gas interests are subject to the same general rules that govern interpretation of contracts. *Miller v. Schwartz*, 354 N.W.2d 685, 688 (N.D.1984). A contract is ambiguous when rational arguments can be made for different positions about its meaning. *Graber v. Engstrom*, 384 N.W.2d 307, 309 (N.D.1986). Whether a contract is ambiguous is a question of law for the court to decide. *Johnson v. Arithson*, 417 N.W.2d 373, 375 (N.D.1987). On appeal, this court will independently review the contract to determine whether it is ambiguous. *Nat'l Bank of Harvey v. International Harvester*, 421 N.W.2d 799, 801 (N.D.1988). If a contract is ambiguous, extrinsic evidence can be considered to clarify the intent of the parties. *Thompson v. Thompson*, 391 N.W.2d 608, 610 (N.D.1986). These contract principles apply to this personal representative's deed.

▋ When both parties claim a contract is unambiguous but advance different rational arguments as to its meaning, a court is not limited by the parties' failure to specifically assert ambiguity. The parties' failure to assert ambiguity does not preclude the court from determining that the contract is ambiguous nor keep the court from considering extrinsic evidence of the parties' intentions. Because this personal representative's deed is ambiguous as to the specific nature of the interest in the Mosser 1–26 that the Estate conveyed to Minex, the trial court erred in refusing to consider extrinsic evidence here.

The Estate argues that, by transferring to Minex all of "Grantor's working interest" in the six wells on the leasehold, including the Mosser 1–26, the Estate conveyed everything Kathleen owned including her working interest. The Estate reasons that "net revenue interest" is the lessee's share of production after subtracting all overriding royalty, oil payments, and other nonoperating interests, so that the term includes the lessee's working-interest expenses as well as the net profit after those expenses are deducted. The Estate claims that the "–0–*" listed under "Working Interest," as explained by the referenced phrase, " *Grantor's share of costs on Mosser 1–26 are paid by the operator," was merely a means of informing Minex that there was a contractual duty owed by a third party to pay those expenses. The Estate contends that the payment of those expenses by Patrick was a beneficial contract right that was assigned to Minex by the granting language of the deed.

Minex relies on the testimony of Rustan, the personal representative of the Estate, and of Dennis Tippets, president of Minex, for its definitions of "net revenue interest" and "working interest." [3] Both Rustan

---

**3.** 8 H. Williams and C. Meyers, *Oil and Gas Law Manual of Oil and Gas Terms*, at pp. 1086–1087 (1987), defines "working interest" as follows:

The operating interest under an oil and gas lease. The owner of the working interest has the exclusive right to exploit the minerals on the land.

In the simple situation of a lessor who executes a lease, reserving ⅛th royalty, to a lessee who creates no burdens on his estate, the working interest consists of ⅞ths of production subject to all costs of exploration and development; the lessor receives his ⅛th of production free of such costs. However, a lessee may transfer out of his working interest an OVERRIDING ROYALTY (*q.v.*), OIL PAYMENT (*q.v.*), NET PROFIT INTEREST (*q.v.*), or CARRIED INTEREST (*q.v.*), leaving himself still as owner of the working interest (and therefore exclusively entitled to operate

on the premises) but as the owner of very little production and the recipient of a small fraction of the income from the property.

Although the term working interest ordinarily refers to an interest acquired by a lease, special context may indicate that it is used to describe a mineral interest. See *Schnitt v. McKellar*, 244 Ark, 377, 427 S.W.2d 202, 30 O. & G. R. 1 (1968).

This term is defined by Federal Power Commission Order No. 411, 46 F.P.C. 1178 at 1180 (Nov. 10, 1971), as an interest "embodying operating rights and/or the right to share in production or revenues from the producing venture, so that its receipt of production or revenues will increase as the production or revenues from the producing venture increase, without any termination of such right to receive production or revenues after the return of the amount of any related advance payment."

and Tippets testified to the effect that "net revenue interest" meant the income from a well and that "working interest," as used in the agreement, meant the costs and expenses associated with a well.[4] Minex argues that placement of the "–0–* " under the heading "Working Interest" means that Minex did not acquire any working interest through the conveyance. Minex argues that the referenced phrase, " *Grantor's share of costs on Mosser 1–26 are paid by the operator," means that the working-interest expenses were not included in the conveyance because the expenses were being paid by the operator. Minex also relies on post-conveyance correspondence between the parties which indicates that expenses on the Mosser 1–26 were not Minex's responsibility.

The trial court reasoned that the treatise definition of "net revenue interest" [*see* Footnote 2], "is consistent with Minex being responsible for expenses after completion of the well." Construing the phrase " *Grantor's share of costs on Mosser 1–26 are paid by the operator," the trial court reasoned that because the sentence uses the verb "are," which is the present tense of the verb "be," it was a true statement at the time of the conveyance and "not a representation that the net revenue interest will be free of such costs in the future."

Because several different rational arguments can be made about the meaning of the disputed language in the deed, we conclude that the language is ambiguous and that a question of fact exists as to what the parties intended by the use of that language. We therefore reverse and remand to the trial court for resolution of this factual question. The trial court, in its discretion, may open the record for additional evidence.[5]

### The Estate vs. Patrick and Petrotech

The Estate brought third-party claims against Patrick and Petrotech requesting that they be substituted as defendants in Minex's main action and, in the alternative, seeking indemnity if Minex recovered against it. The Estate argues that the evidence shows a contract by Patrick to pay Kathleen's share of working-interest expenses on Mosser 1–26 and that the evidence also supports a determination that Patrick and Petrotech are estopped from claiming that they paid Kathleen's share of working-interest expenses for several years by mistake. The trial court did not reach these questions because it dismissed Minex's claim against the Estate. Because we reverse the dismissal of Minex's claim against the Estate, we likewise reverse the trial court's dismissal of the Estate's third-party claims against Patrick and Petrotech. We remand for consideration of these

---

For some purposes (*e.g.,* indicating who bears what proportion of expenses in a situation where the working interest is divided) the working interest is stated as a unity and the share of expenses borne by each party is stated in decimal or percentage (usually decimal) terms. To be distinguished from working interest is NET REVENUE INTEREST (*q.v.*), also stated in decimal or percentage terms. Thus where a lease reserving a one-eighth royalty is executed to A, who thereafter assigns one-fourth of his interest to B, the lessor owns none of the working interest but has a 0.125 net revenue interest, A owns 0.75 of the working interest and has a net revenue interest of 0.65625, and B owns 0.25 of the working interest and has a 0.21875 net revenue interest.

See also *Miller v. Schwartz,* 354 N.W.2d 685, 84 O. & G. R. 143 (N.D.1984), quoting a portion of this MANUAL'S definition and concluding that "it appears that the term 'working interest,' as commonly used in the oil industry, is generally synonymous with the term 'leasehold interest.' "

4. Given the various contexts in which the words "net revenue interest" and "working interest" can be employed, we do not believe that the somewhat simplified definitions given to the terms by Tippets and Rustan are necessarily incompatible with the definitions set forth in 8 H. Williams and C. Meyers, *Oil and Gas Law Manual of Oil and Gas Terms,* at pp. 601–602 and 1086–1087 (1987).

5. The Estate argues that we should affirm dismissal of Minex's complaint because Minex would not be liable for the working interest expenses on Mosser 1–26 if it had not, by appearing pro se, negligently handled its defense to Jerry Chambers Exploration's 1986 lawsuit. The trial court did not address this argument in its findings and conclusions. The trial court may also consider this question on remand.

claims if Minex prevails on its claim against the Estate.

### Patrick vs. The Estate

■ Patrick appealed the dismissal of its counterclaim against the Estate seeking reimbursement of amounts that it claims to have mistakenly paid for Kathleen's working-interest expenses on the Mosser 1–26. The trial court dismissed the claim, concluding that it was barred by NDCC 30.1–19–03 (UPC 3–803), the non-claim provisions in the probate code.

A creditor's claim against an estate is barred if not presented within three months after the date of the first publication of notice to creditors, or within three months after the claim arises if it arises at or after the decedent's death. NDCC 30.1–19–03(1)(a) and (2)(b).[6] Notice to creditors was first published on May 5, 1983, and Patrick made no claim until it filed its answer and counterclaim in May 1989. Patrick recognizes that its claim against the Estate was not timely filed, but Patrick argues that it should be allowed to use a barred claim against the Estate to reduce the Estate's claim against it. Under the circumstances here, we agree.

In *Linster v. Holmen,* 116 N.W.2d 616 (N.D.1962), and *Larson v. Quanrud, Brink & Reibold,* 78 N.D. 70, 47 N.W.2d 743 (1950), this court held that in a suit by an administrator for an estate, a defendant may, after the time for filing claims against the estate has expired, plead and prove an unfiled claim to reduce an estate's claim. In *Linster,* 116 N.W.2d at 619, the court reasoned:

> [W]hile the defendant's claim may be barred, the debt remains and the recovery by the plaintiff, administrator, should properly be limited to the net debt due the estate from the defendant.

Although these decisions predate adoption of the Uniform Probate Code in North Dakota, we see nothing in the language of NDCC 30.1–19–03 or in the drafter's comments to UPC 3–803 that rules out the application of defensive recoupment. The Nebraska Supreme Court, construing its state's adoption of the same Uniform Probate Code provision, has held that the defense of recoupment is not barred by the non-claim statute. *See In re Estate of Massie,* 218 Neb. 103, 353 N.W.2d 735, 740 (1984), *overruled on other grounds In re Estate of Price,* 223 Neb. 12, 388 N.W.2d 72, 77 (1986). North Dakota, like some

---

**6.** The version of NDCC 30.1–19–03 (UPC 3–803) that governs this case said:

> *Limitations on presentation of claims.*—1. All claims against a decedent's estate which arose before the death of the decedent, including claims of the state and any subdivision thereof, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract, tort, or other legal basis, if not barred earlier by other statute of limitations, are barred against the estate, the personal representative, and the heirs and devisees of the decedent, unless presented as follows:
>
> a. Within three months after the date of the first publication of notice to creditors if notice is given in compliance with section 30.1–19–01; provided, claims barred by the nonclaim statute at the decedent's domicile before the first publication for claims in this state are also barred in this state.
>
> b. Within three years after the decedent's death, if notice to creditors has not been published.
>
> 2. All claims against a decedent's estate which arise at or after the death of the decedent, including claims of the state and any subdivision thereof, whether due or to be-

come due, absolute or contingent, liquidated or unliquidated, founded on contract, tort, or other legal basis, are barred against the estate, the personal representative, and the heirs and devisees of the decedent, unless presented as follows:

> a. A claim based on a contract with the personal representative within four months after performance by the personal representative is due.
>
> b. Any other claim, within three months after it arises.
>
> 3. Nothing in this section affects or prevents:
>
> a. Any proceeding to enforce any mortgage, pledge, or other lien upon property of the estate.
>
> b. To the limits of the insurance protection only, any proceeding to establish liability of the decedent or the personal representative for which he is protected by liability insurance.

The 1989 Legislature amended this statute by adding the words "and mailing" between the words "first publication" and "of notice to creditors" in subdivision 1(a). 1989 N.D.Sess. Laws Ch. 404 § 3.

other states, has traditionally allowed defensive recoupment against claims by an estate.

■■■■ Recoupment is an equitable doctrine with its own unique characteristics: it must arise out of the same transaction that is the subject matter of the plaintiff's action and it can only be used to reduce or avoid the plaintiff's recovery. *E.g., Household Finance Corp. v. Pugh,* 288 N.W.2d 701, 704 (Minn.1980); 20 Am. Jur.2d *Counterclaim, Recoupment, and Setoff* § 6 (1965). It is not a "weapon of offense." 20 Am.Jur.2d *Counterclaim, Recoupment, and Setoff,* at p. 232. Recoupment cannot be used to obtain affirmative relief. *W.J. Kroeger Co. v. Travelers Indemnity Company,* 112 Ariz. 285, 541 P.2d 385, 388 (1975). Recoupment differs from a counterclaim, which may arise out of a separate transaction and allows for affirmative relief and recovery in excess of that sought by the plaintiff, and from a setoff, which involves a transaction unrelated to the plaintiff's action. *See Household Finance Corp. v. Pugh,* 288 N.W.2d at 704 n. 5; 3 *Moore's Federal Practice* ¶ 13.02, at p. 13–13 n. 1 (1990). Recoupment is purely defensive.

■■■■ Counterclaims and setoffs are usually barred by operation of a statute of limitation. 51 Am.Jur.2d *Limitation of Actions* § 78 (1970). On the other hand, it is widely held that a statute of limitation does not defeat defensive recoupment, but that it survives as long as the plaintiff's cause of action exists. *See Stone v. White,* 301 U.S. 532, 539, 57 S.Ct. 851, 854, 81 L.Ed. 1265 (1937); Annot., *Claim barred by limitation as subject of setoff, counterclaim, recoupment, cross bill, or cross action,* 1 A.L.R.2d 630, at 666 (1948); Annot., *Presentation of Claim to Executor or Administrator As Prerequisite of its Availability as Counterclaim or Setoff,* 36 A.L.R.3d 693 (1971); 51 Am.Jur.2d *Limitation of Action,* at § 77; 6 Wright and Miller, *Federal Practice and Procedure: Civil* § 1419 (1990); 3 *Moore's Federal Practice,* at ¶ 13.11. We agree with the weight of authority that a claim in the nature of a recoupment defense survives as

long as the plaintiff's cause of action exists, even if affirmative legal action upon the subject of recoupment is barred by a statute of limitations. Therefore, NDCC 30.1–19–03 does not bar defensive recoupment.

Our recognition of defensive recoupment here is not inconsistent with this court's decisions in *Dickinson Air Service, Inc. v. Kadrmas,* 397 N.W.2d 55 (N.D.1986), and *Schroeder Aviation, Inc. v. DeFehr,* 283 N.W.2d 147 (N.D.1979). In *Kadrmas* and *DeFehr,* this court approved the dismissal of each defendant's tort counterclaim for damages because the defendant failed, under NDCC 28–01–40 and 28–01–41, to timely file and serve a verified loss report as a condition precedent to a claim for damages from use of agricultural chemicals. Defensive recoupment was not specifically mentioned in either case. The applicability of statutes of limitation to counterclaims in general and to setoffs, as we earlier noted, differ substantially from defensive recoupment.

■■■■ In this case, Patrick's pleadings specifically assert that "any sums paid as costs on behalf of Kathleen O'Connell's working interest after payout on the well were paid in error and that Patrick Petroleum is entitled to a set-off against any sums determined to be owed" to the Estate. Use of the term "set-off" rather than the term "recoupment" is not fatal if the claim in fact arises out of the same transaction as the plaintiff's action. *Garza v. Allied Finance Co.,* 566 S.W.2d 57, 63 (Tex.Ct.Civ. App.1978). *See also Tuloka Affiliates, Inc. v. Moore,* 275 S.C. 199, 268 S.E.2d 293, 295 (1980) [use of term "counterclaim" is irrelevant if claim is in the nature of a recoupment defense]. The Estate's claim against Patrick and Patrick's claim against the Estate arise out of the same transaction, *i.e.,* payment of Kathleen's working interest expenses. Therefore, defensive recoupment is applicable here.

We conclude that the trial court erred in dismissing Patrick's defense against the Estate insofar as the dismissal prohibits Patrick's use of recoupment. Patrick may

assert its defense to reduce the Estate's recovery, if any, against Patrick.

### Petrotech vs. Patrick

Petrotech appealed the trial court's dismissal of its cross-claim against Patrick for any "sums that it be responsible for as a result of" the Estate's third-party claim against it, including costs, disbursements, and attorney fees. The trial court dismissed the cross-claim because it had dismissed the Estate's third-party claim and, therefore, there was no basis for a judgment against Petrotech. The trial court also denied the request for attorney fees in defending the third-party claim, concluding that "Petrotech failed to meet its burden of proof on the issue of attorneys fees."

Patrick's assignment to Petrotech contains this clause:

Assignor agrees to indemnify, defend and save Assignee harmless from any liability, causes of action, claims, demands or defaults resulting from acts or omissions of Assignor which have occurred prior to August 9, 1983. Assignee agrees to indemnify, defend and save Assignor harmless from any causes of action, claims, demands or default resulting from acts or omissions of Assignee which occur on or after said date.

Patrick argues that the trial court properly dismissed Petrotech's cross-claim because the Estate's third-party claim does not raise a question about an act or omission by Patrick before August 9, 1983. Petrotech argues that the Estate's claim is based solely on Patrick's acts prior to August 9, 1983, and that, under this court's decision in *Hoge v. Burleigh County Water Management Dist.*, 311 N.W.2d 23 (N.D. 1981), Patrick is responsible for Petrotech's attorney fees in defending the third-party claim. Neither party is correct.

The Estate's claim against Patrick is based on the August 7, 1978, lease, the accompanying letter agreement between Kathleen and Patrick, and subsequent representations made by Patrick prior to August 9, 1983. The Estate's third-party complaint asserts that "Patrick Petroleum, through its employees and agents, represented to Kathleen O'Connell, and later to the representatives of the Estate ... that the intent of the parties to the letter agreement ... was that Patrick Petroleum Company and its assigns would pay all costs on Kathleen O'Connell's working interest before and after payout." The Estate also asserts that Patrick "paid all costs attributable to Kathleen O'Connell's working interests through the time of assignment of its interests and obligations in Mosser 1–26 to Petrotech...."

The Estate's claim against Petrotech is partially based on Petrotech's actions after August 9, 1983. The Estate asserts that "from August 8, 1983, until April 4, 1984, Petrotech, Inc. paid all costs on Mosser 1–26 represented by Kathleen O'Connell's working interest and did not claim or notify any person or entity that it disputed its contractual obligation to pay such costs." According to the Estate, it and Kathleen "relied on the representations and conduct of Patrick ... and Petrotech ... to their detriment." Thus, the Estate seems to seek indemnity for both Patrick's own pre-assignment acts and Petrotech's own post-assignment acts.

Under the indemnity provisions of the assignment agreement, Patrick and Petrotech divide responsibility for indemnification between themselves depending on whether any "liability, causes of action, claims, demands or defaults" resulted from Patrick's pre-assignment acts or omissions or resulted from Petrotech's post-assignment acts or omissions. Still, it is not clear to what extent the Estate seeks to hold Petrotech liable for Patrick's pre-assignment acts and to hold Patrick liable for Petrotech's post-assignment acts. Correspondingly, the trial court made no findings on whether any liability of Petrotech would result from Patrick's pre-assignment acts, nor on whether any liability of Patrick would result from Petrotech's post-assignment acts. At this point, we are unable to determine to what extent the indemnity clause of Patrick's assignment to Petrotech applies. We therefore reverse the trial court's dismissal of Petrotech's cross-claim against Patrick for indemnity, including at-

torney fees, and remand for resolution of these factual questions.

Accordingly, the judgment is reversed and the cases are remanded for proceedings consistent with this opinion.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.